*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TUYEN DINH, | ) | |
| | ) | Supreme Court No.  S-18262 |
| Appellant, | ) | |
| | ) | Superior Court No.  3UN-20-00015 CI |
| v. | ) | |
| | ) | O P I N I O N |
| MATTHEW RAINES and MELISSA CLAYTON, | ) | |
| | ) | No. 7688 – February 23, 2024 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Unalaska, Herman G. Walker, Jr., Judge.

Appearances:  Taylor R. Thompson, Thompson Law Group, Anchorage, for Appellant.  No appearance by Appellees Matthew Raines and Melissa Clayton.

Before:  Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I.    Introduction

Tenants complained to their landlord about the habitability of a rental unit. After the landlord failed to address the issues, the tenants withheld rent and asked the landlord to reimburse their additional utilities costs.  The landlord refused and, instead, evicted the tenants for nonpayment of rent.

The superior court held a damages trial. The landlord sought unpaid rent and compensation for damage to property. The tenants counterclaimed, accusing the landlord of violating multiple provisions of the Uniform Residential Landlord and Tenant Act (URLTA). The court largely found in favor of the tenants and awarded them damages, interest, and attorney's fees.

We affirm the superior court's findings that the landlord failed to maintain the premises in a habitable condition as required under AS 34.03.100 and willfully[1] diminished the tenant's essential services under AS 34.03.210. We reverse the court's conclusion that the tenants can recover for the landlord's failure to deliver possession under AS 34.03.170. We affirm aspects of the court's award of damages, but reverse those awards that are not supported by the record.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Dinh's apartment building

Tuyen Dinh owns an apartment building in Unalaska. The apartment building was zoned as a residential single-family duplex with two dwelling units, 178 and 180 Chernofski Drive. In 2016 Dinh obtained a conditional use permit to add a third dwelling unit to the building, 176 Chernofski Drive. The conditional use permit specified that the property owner was not authorized to "modify the building in the future to include any more than three dwelling units" and "[t]he electric service must have one meter for each dwelling unit and one meter for any common spaces, such as a boiler room."

---

[1] We use the American spelling "willfully" except when quoting URLTA, which uses the British spelling "wilfully." *See* AS 34.03.040(b), .070(d), .170(b), .210, .230(a), .280, .290(c).

Each unit had three stories. The lower stories of 178 and 180 Chernofski Drive had ground-level one-car garages, while 176 Chernofski Drive had a similar storage space.

In 2017 a complaint was filed with the city against Dinh alleging that he had built additional unpermitted dwelling units into the garage areas in violation of his conditional use permit. The city investigated the complaint, notified Dinh that he was "in apparent violation" of his conditional use permit, and threatened to take legal action. Dinh applied to amend his conditional use permit "to allow additional rooms on the garage level." The application was denied. But no legal enforcement action was taken at that time and the unpermitted rooms remained in Dinh's apartment building.

### 2.    Dinh's rental agreement with Clayton and Raines

In late 2019, Matthew Raines was seeking housing for himself and Melissa Clayton, his fiancée at the time. Clayton and Raines scheduled a tour of 176 Chernofski Drive with Dinh and Lisa Tran, Dinh's daughter. The group ascended the stairs and toured the apartment. Tran filled out an inspection checklist.

Upon completing the apartment tour, Clayton and Raines signed a rental agreement, leasing the apartment from Dinh for a one-year period. The rental agreement, provided by Dinh, described the premises as "END UNIT TOWNHOUSE - 3 BEDROOM, 2 BATH" and provided that "[n]o other portion of the building . . . wherein the Premises [are] located is included unless expressly provided for in this Agreement." Handwritten additions to the rental agreement provided that the tenants could place a shipping container on the property for storage. The rental agreement also provided that "[s]moking is not permitted inside the leased Premises." Dinh agreed "to maintain the Premises in reasonably good repair at all times and perform repairs reasonably necessary to satisfy any implied warranty of habitability." Finally, the rental agreement specified that "[t]enant shall be responsible for all utilities and services incurred in connection with the Premises."

Clayton and Raines moved into the apartment that night. The next day, Tran emailed Clayton and Raines an electronic copy of the lease agreement, attaching the inspection checklist she had filled out during the apartment tour, which she had signed on Dinh's behalf. Raines's shipping container was placed in an open area adjacent to the side of the building where the apartment was located.

### 3. Clayton and Raines's tenancy

In addition to owning the apartment building, Dinh owned a restaurant in Unalaska. While Dinh was renting the apartment to Clayton and Raines, Dinh was allowing his restaurant employees to live rent-free in the unpermitted dwelling units within the building. Clayton and Raines testified that Dinh did not tell them about this arrangement during the apartment tour and that they discovered the employees only after signing the rental agreement. Raines testified that while walking through the garage to inspect the boiler he walked past the unpermitted dwelling units, which were deadbolted shut. Raines testified that he inquired about the locked rooms and that Dinh said the rooms were "for storage only." Dinh and Tran testified that they told Clayton and Raines that Dinh's employees would be staying in the garage rooms before signing the rental agreement.

Soon after moving in, Clayton and Raines experienced issues with the apartment. Clayton and Raines heard loud noises coming from the garage. They smelled cigarette smoke, which emanated from the garage and drifted up the stairs. The smoke caused Raines asthma attacks. Clayton and Raines testified that they reported the smoke to Dinh and Tran.

More problems arose. A neighbor confronted Raines about the location of his shipping container, claiming that it was not on Dinh's property. A surveyor confirmed that the shipping container was partially on the neighbor's property. Dinh testified that he told Raines to move the shipping container to the other side of the building. But Raines testified that Dinh never made room on the other side, which was always occupied by parked cars.

Around three months into the lease Clayton moved out of the apartment and left the state. Clayton and Raines testified that Clayton left because of personal disagreements with Raines, which were aggravated by the stress of living in the apartment.

Raines noticed issues with the apartment's utilities. The temperature in the apartment would sometimes become too hot. He testified that he frequently lacked hot water. He testified that in March 2020 he lost hot water and went to check the boiler. While in the garage, Raines discovered that one of Dinh's employees had spliced into his cable television and internet. Raines went to Dinh's restaurant to confront him about the issue, but because Dinh was out of town, he reported the issue to Duy Tran, Lisa Tran's husband. Raines testified that Duy Tran told him to stop paying rent until the issue was resolved.

Lisa Tran testified that Raines told her Dinh's employees were stealing internet and cable. Tran testified that she notified Dinh about the issue, asked Raines to provide her with "invoices or proof of some sort," and assured Raines she would speak with Dinh's employees about the issue or have her parents do so. Raines unhooked the spliced internet and cable connection and switched to a new internet and cable provider.

In April 2020, Raines started withholding rent. Dinh texted Raines asking him to pay rent, and Raines replied that he would not pay rent until he was reimbursed for the stolen internet and cable. Raines testified that he also called Dinh to discuss the issue. Raines testified that Dinh threatened to come to the apartment and throw out Raines's possessions. Tran later obtained a trespass order preventing Raines from entering Dinh's restaurant. Raines never provided Dinh with receipts for the cost of the extra utilities.

Dinh provided Raines with a written notice to quit in May 2020 seeking $2,200 in unpaid rent. In early June, Dinh served Raines with a "5-Day Notice to Quit," seeking to terminate the lease.

### 4. City investigation

Raines filed a report with city officials in early June 2020 alleging theft of services by Dinh. Officials investigated and confirmed that the unpermitted dwelling units in the garage were being occupied by Dinh's employees. Officials also found numerous housing and fire code violations.

Later that month the city notified Dinh that he was in violation of his conditional use permit. The notice identified "at least three one room dwelling units, a shared bathroom, and a shared laundry area that are not included in the building plans submitted with the property building application." One week later the city officially revoked Dinh's conditional use permit. The revocation identified the remedial actions available to Dinh and described the penalties for continued noncompliance.

## B. Proceedings

### 1. Eviction proceedings

On June 13, 2020, Dinh filed a complaint for forcible entry and detainer to evict Clayton and Raines, to recover possession of the apartment, and to obtain damages for unpaid rent. Raines answered and counterclaimed under Alaska's URLTA provisions,[2] alleging retaliation, unlawful entry into a leased dwelling without notice or permission, failure to return or account for a security deposit, and failure to maintain a habitable dwelling.

Raines also alleged that Dinh had housed three people in the basement who were "using/stealing" electricity, fuel, cable, and internet. Raines hired a heating technician to trace the fuel and electricity lines going into the boiler and the hot water and heat lines coming off of the boiler. The technician testified that the boiler was drawing power from Raines's electric meter, using fuel from Raines's fuel tank, and supplying the garage bathroom with hot water. The technician also testified that he traced four heat lines coming off of the boiler. Two went upstairs to the apartment, one

---

[2]    URLTA is codified at AS 34.03.010-.360.

provided radiant heat to the garage-level common area, and one "disappeared into the floor."

A superior court master held a hearing on the issue of possession. The master found that Raines did not pay rent in April, May, June, and July, which totaled $8,800. The master found that Raines had notified Dinh in writing, via text message on April 15, 2020, that Dinh's employees were using Raines's utilities. The master concluded that Raines could deduct the actual costs of heating fuel and electricity from rent under AS 34.03.180.[3] But the master also concluded that internet and cable were not "essential services." The master recommended granting Dinh possession of the apartment because the amount of unpaid rent exceeded Raines's deductible costs. The superior court adopted the master's recommendations and ordered Raines to vacate the apartment.

Raines hired a friend to help him move out of the apartment. While Raines was moving a couch, his foot went through the floor of the apartment. Raines testified that the hole in the floor showed signs of water damage, and his friend testified that "the condition of the wood" was "really bad" and "the condition of the floor was very bad." After Raines moved out, Dinh kept Raines's security deposit and requested an additional $11,696.53 for back rent, lost keys, and repairs, including fixing door trim, repainting the apartment, and patching the hole in the floor.

### 2. Damages trial

The superior court held a damages trial which took place over multiple days from November 2020 to April 2021. The court found that Dinh's violation of the housing code, fire code, and his conditional use permit — including housing his

---

[3]    *See* AS 34.03.180 (providing that if landlord "deliberately or negligently fails to supply running water, hot water, heat, sanitary facilities, or other essential services," tenant may "recover damages based on the diminution in the fair rental value of the dwelling unit" after giving "written notice to the landlord specifying the breach").

employees in the unpermitted dwelling units — had "impact[ed] the habitability of the home" in violation of AS 34.03.100.[4] The court found that the violations "did not make [the apartment] uninhabitable" but that "the value of the leasehold was . . . diminished by the rent that was not paid" pursuant to AS 34.03.190.

The superior court found Dinh knew his employees were using Clayton and Raines's electricity and hot water, and Dinh "had complete control over the premises" but had not stopped the interference, thus making him liable for the cost of Raines's electricity and heating fuel under AS 34.03.160.[5] The court also found Dinh liable for the cost of Clayton and Raines switching cable and internet providers. The court ordered Dinh to pay for Raines's moving expenses and to return the security deposit. The court found that pre-existing water damage had caused paint to peel and weakened the floor; it denied Dinh damages for the cost of repainting the apartment and patching the hole in the floor. But the court awarded Dinh damages for the cost of repairing the door trim.

The superior court found that Dinh had willfully diminished Clayton and Raines's basic services and consequently reduced the value of their leasehold under AS 34.03.210.[6] The court also ruled that Dinh had "willful[ly] and not in good faith"

---

[4] AS 34.03.100 (requiring that landlord maintain fit premises, make repairs, keep common areas safe and clean, maintain facilities and appliances, remove garbage, provide water and heat, provide locks and keys, and provide smoke detectors).

[5] AS 34.03.160(b) (providing that "tenant may recover damages and obtain injunctive relief for any noncompliance by the landlord with the rental agreement or AS 34.03.100, 34.03.210, or 34.03.280," except as otherwise provided by URLTA).

[6] AS 34.03.210 (providing that if landlord "wilfully diminishes services to the tenant by interrupting or causing the interruption of electric, gas, water, sanitary, or other essential service to the tenant, the tenant may recover possession or terminate the rental agreement and, in either case, recover an amount not to exceed one and one-half times the actual damages").

failed to deliver possession of the apartment under AS 34.03.170. Regarding Dinh's lack of good faith, the court found that:

> [Dinh] leased an apartment where he knew illegal tenants were living in the garage. These same illegal tenants were using the hot water and tapped into [Raines and Clayton's] utilities. [Dinh] did not tell [Raines and Clayton] about the illegal tenants. [Raines] testified that [when] he asked what was behind the boards in the garage, he was told "storage." It was human storage.

The court awarded Raines a total of $20,000 in "exemplary damages," consisting of $10,000 in damages for each of the two violations. The court found "insufficient evidence" of retaliation under AS 34.03.310.[7] The court issued a final judgment, awarding Clayton and Raines damages, interest, and attorney's fees totaling $63,947.94.

Dinh now appeals the superior court's damages award.

## III. STANDARD OF REVIEW

We review the superior court's statutory interpretations de novo.[8] We construe statutes using three factors: "the language of the statute, the legislative history, and the legislative purpose behind the statute."[9]

---

[7]    *See* AS 34.03.310 (providing that landlord may not retaliate "by increasing rent or decreasing services or by bringing or threatening to bring an action for possession *after* tenant has (1) complained to the landlord of a violation of AS 34.03.100; (2) sought to enforce rights and remedies granted the tenant under this chapter; . . . or (4) complained to a governmental agency responsible for enforcement of governmental housing, wage, price, or rent controls" (emphasis added)).

[8]    *Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1093 (Alaska 2023).

[9]    *Id.* (quoting *Oels*, 279 P.3d at 595).

"Leases are contracts," so we review their interpretation de novo with respect to questions of law.[10]  However, "we apply the clearly erroneous standard in reviewing the [superior] court's background findings of fact" used as a basis for its interpretation of a contract.[11]

We "review the superior court's evidentiary rulings for an abuse of discretion."[12]  We "will find an abuse of discretion when the decision on review is manifestly unreasonable."[13]  But we will reverse "only if 'the error affected the substantial rights of a party.' "[14]

When the superior court acts as a "trier of fact," we review the superior court's factual findings for clear error.[15]  We also review the superior court's damages awards for clear error.[16]  But we apply our "independent judgment in deciding whether the trial court's award of damages is based on an erroneous application of law."[17]  Clear

---

[10]     *Rockstad v. Glob. Fin. & Inv. Co.*, 41 P.3d 583, 586 (Alaska 2002) (citing 49 AM. JUR. 2D *Landlord and Tenant* § 43 (1995)).

[11]     *Id.* (citing *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 122 (Alaska 1991)).

[12]     *Guilford*, 522 P.3d at 1093 (citing *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016)).

[13]     *Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 619 (Alaska 2021) (quoting *Sykes v. Lawless*, 474 P.3d 636, 646 (Alaska 2020)).

[14]     *Id.* at 620 (quoting *Ray v. Draeger*, 353 P.3d 806, 810 (Alaska 2015)).

[15]     *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392 (Alaska 2017), *as amended on reh'g*, (May 9, 2017) (first quoting *Wasserman v. Bartholomew*, 38 P.3d 1162, 1166 (Alaska 2002); then quoting *Lentine v. State*, 282 P.3d 369, 375-76 (Alaska 2012)).

[16]     *Griffith v. Hemphill*, 521 P.3d 584, 590 (Alaska 2022) (citing *Burton*, 393 P.3d at 392).

[17]     *Burton*, 393 P.3d at 393 (quoting *Beaux v. Jacob*, 30 P.3d 90, 97 (Alaska 2001)).

error exists "when 'after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made.' "[18]

## IV.   DISCUSSION

This case is a landlord-tenant dispute controlled by URLTA.  URLTA is a model code that has been adopted by a number of states, including Alaska.[19]  The purposes of URLTA are to (1) "simplify, clarify, modernize, and revise the law governing the rental of dwelling units and the rights and obligations of landlord and tenant;" (2) "encourage landlord and tenant to maintain and improve the quality of housing; and" (3) "make uniform the law among those states that enact it."[20]  More specifically URLTA codifies rights and remedies for residential landlords and tenants. "By its own terms, [URLTA] is to be 'liberally construed and applied to promote its underlying purposes and policies.' "[21]

For the reasons explained below, we affirm the superior court's rulings on habitability and willful diminution of services, but we reverse its ruling as to failure to deliver possession.[22]  We affirm the damages awards that are supported by the record,

---

[18]     *Id.* at 392 (quoting *Laybourn v. City of Wasilla*, 362 P.3d 447, 453 (Alaska 2015)).

[19]     AS 34.03.010 *et seq.*; *see* Robert D. Mercer-Falkoff, Note*, Uniform Residential Landlord and Tenant Act: The Impact of Existing State Laws*, 7 J. LEGIS. 158, 158-59 & n.2 (1980).

[20]     AS 34.03.010.

[21]     *Sullivan v. Subramanian*, 2 P.3d 66, 69 (Alaska 2000) (quoting AS 34.03.010).

[22]     Dinh argues that the superior court erred by admitting exhibits showing violations of his conditional use permit and various housing codes.  He maintains the exhibits should have been excluded as inadmissible hearsay and as unfairly prejudicial under Evidence Rule 403.  But Dinh did not make any of these evidentiary arguments to the superior court.  Further, Dinh fails to argues on appeal that the superior court committed plain error.  Thus these arguments are waived. *See Anchorage Nissan, Inc.*

totaling $6,106.58, but we reverse other damages awards and vacate the two $10,000 "exemplary damages" awards because they lack a firm basis in the evidence.

### A. The Superior Court Correctly Concluded That Dinh Violated The Warranty Of Habitability Under AS 34.03.100(a).

Dinh filed a complaint for forcible entry and detainer to evict and recover the apartment because Clayton and Raines did not pay rent between April and July 2020.[23] After obtaining possession of the apartment, Dinh also sought recovery of unpaid rent.[24]

Alaska Statute 34.03.190(b) allowed Clayton and Raines to counterclaim "for any amount recoverable under the rental agreement or [URLTA]."[25] Clayton and

---

*v. State*, 941 P.2d 1229, 1239-40 (Alaska 1997) ("Issues not raised in the court below are ordinarily considered waived and will not be considered on appeal, except where plain error has been committed.").

[23] *See* AS 09.45.070 (providing cause of action to recover possession for forcible entry or detention); *see also* AS 34.03.220(b) (providing that upon proper notice landlord may terminate rental agreement for tenant's failure to pay rent).

[24] *See* AS 34.03.220(c) (providing that landlord may recover actual damages for tenant's noncompliance with rental agreement).

[25] The superior court's order cited to "AS 33.03.090(a)," which is a statute that does not exist. We conclude that this citation reflected a typographical error and the superior court intended to cite AS 34.03.190, which provides in part:

> In an action for possession based upon nonpayment of the rent or in an action for rent when the tenant is in possession, the tenant may counterclaim for any amount recoverable under the rental agreement or this chapter. If a counterclaim is made, the court shall determine whether the defense is supported by the evidence and, if so, may order that . . . the periodic rent is to be reduced to reflect the diminution in value of the dwelling unit during the period of noncompliance . . . .

Raines sought to recover damages under AS 34.03.160(b), alleging that Dinh breached the rental agreement and the warranty of habitability AS 34.03.100 imposed.[26]

On appeal Dinh now raises various arguments for why he did not violate the warranty of habitability, each of which we address below.

### 1. The impaired habitability of the apartment diminished the value of the leasehold.

At trial Clayton and Raines presented evidence in an attempt to show that the habitability of the apartment was impaired. AS 34.03.190(a) requires the superior court to evaluate whether this evidence supported Clayton and Raines's counterclaim. If the evidence did support their counterclaim, the superior court could reduce the amount of rent owed "to reflect the diminution in value of the dwelling unit during the period of noncompliance."[27] The court found that Dinh had violated AS 34.03.100 and that the violation had caused the value of Clayton and Raines's "leasehold [to] diminish[] by the $8,800 that [wa]s owed in past rent." Dinh argues that this finding was erroneous. We disagree.

The superior court listed a number of code violations that impacted the habitability of the apartment. These violations included (1) a storage room that was plumbed for a bathroom; (2) fire and building safety code violations; (3) missing fire extinguishers; (4) exposed wiring and dangling lights from wires; and (5) poor ventilation resulting in mildew and molding. The court explained how these violations also "led to other problems that impacted the habitability of the home."

---

[26] AS 34.03.100 (requiring that landlord must "make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition"); *see also Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1097 (Alaska 2023) (explaining that AS 34.03.160(b) creates "general remedy for the landlord's noncompliance with the rental agreement or the warranty of habitability").

[27] AS 34.03.190(a).

The court also described how Dinh's employee's cigarette smoke caused Raines asthma attacks and "caused tension" between Clayton and Raines, which decreased their use and enjoyment of the premises. The court found that Dinh's employees improperly used Clayton and Raines's utilities, which caused Clayton and Raines to incur additional costs from "internet and oil bills [that] were excessive." Raines had to take cold showers because there was no hot water. Because Dinh allowed these conditions to exist, the court determined that the "leasehold value was diminished because of [Dinh's] conduct."

Not every violation of the housing code constitutes a violation of the landlord's duty to maintain habitability.[28] Instead, we look to the conditions in the rental unit to determine whether the landlord has violated AS 34.03.100(a). In this case, the court noted a constellation of problems Raines endured, which included lacking clean air to breathe and warm water for bathing.

We have noted that diminished rental value is a proper measure of damages under URLTA, provided that the value is proved.[29] The Alaska pattern jury instructions also recognize diminished rental value as a proper measure of damages, providing "three possible methods of assessing damages" for habitability violations that "do not include injury to person or property, but merely involve [a tenant's] aggravation."[30]

---

[28] *See* AS 34.03.100(a) (listing a landlord's specific duties).

[29] *See Sullivan v. Subramanian*, 2 P.3d 66, 71 (Alaska 2000) ("Nothing in [AS 34.03.160] suggests that diminished rental value is an impermissible form of damages, when actually proved.").

[30] Alaska Pattern Jury Instructions – Civ. 30.00 (describing "market value theory," "percentage reduction theory" and third method, which "straightforwardly award[s]" damages by calculating "the value of [the tenant's] inconvenience and suffering").

Based on the conditions in Raines's rental unit, the court found that the apartment was not entirely uninhabitable, but that its value had been diminished. The court's finding drew on relevant evidence presented at trial and explained how conditions in the rental unit gave rise to habitability violations, which diminished the rental value of the leasehold in the amount of $8,800. We see no clear error in this finding.

### 2. The superior court did not hold Dinh strictly liable for violations of the housing code.

Dinh argues that the superior court was required to perform a negligence analysis before awarding diminution-in-value damages for Clayton and Raines's counterclaim. Dinh points to our statement in *Newton v. Magill* that the "rejection of the general rule of landlord immunity does not make landlords liable as insurers."[31] The tenant in *Newton* brought a personal injury "slip and fall" negligence claim, not a counterclaim under URLTA.[32] In this case Clayton and Raines did not assert a negligence claim nor did they allege any personal injuries. We have noted that "[f]ault is irrelevant" to habitability claims under URLTA.[33] And we have explained that "URLTA created a damages action for a different kind of injury, governed by different standards, than a common law tort action, which provides a remedy for personal injury."[34]

---

[31]    872 P.2d 1213, 1218 (Alaska 1994). *But see id.* (departing from a general rule of immunity because "it would be inconsistent with a landlord's continuing duty to repair premises imposed under the URLTA to exempt from tort liability a landlord who fails in this duty").

[32]    *Id.* at 1214.

[33]    *Helfrich v. Valdez Motel Corp.*, 207 P.3d 552, 561 (Alaska 2009); *see also Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1106 (Alaska 2023) (distinguishing between tort claim and URLTA claim for purposes of attorney's fees).

[34]    *Guilford*, 522 P.3d at 1106.

Under URLTA Clayton and Raines were "entitled to recover damages if they established *any noncompliance* . . . with AS 34.03.100(a) that appreciably reduced their rental values."[35] Dinh's argument that "[t]here is no negligence per se in Alaska for landlords when there are no damages" conflates tort claims with URLTA claims, which are distinct causes of action. A common law negligence analysis, as proposed by Dinh, is inapposite to our evaluation of Clayton and Raines's URLTA counterclaim, which was premised purely on habitability violations arising under AS 34.03.100.

Dinh similarly argues that Clayton and Raines may only recover diminution-in-value damages for cigarette smoke by proving that Dinh was personally blowing smoke into the apartment. Dinh states that "[t]here was no evidence that the landlord even smoked, let alone that he was the one smoking and exhaling secondhand smoke into the apartment." In support Dinh attempts to rely on *DeNardo v. Corneloup*.[36] His reliance on *Denardo* is misplaced: There the tenant claimed that the landlord breached the covenant of quiet enjoyment,[37] but here Raines claims Dinh breached statutory habitability requirements. A landlord breaches the covenant of quiet enjoyment only if the landlord caused a "substantial" disturbance.[38] In contrast, a landlord violates URLTA's habitability requirements when he fails to comply with certain statutory duties.

Alaska Statute 34.03.100(a) states that "the landlord shall . . . maintain in good and safe working order and condition all . . . ventilating . . . facilities and appliances," which includes ventilation from all secondhand smoke, not just the landlord's secondhand smoke. We have noted that "URLTA damages compensate

---

[35]    *See Sullivan v. Subramanian*, 2 P.3d 66, 71 (Alaska 2000) (emphasis in original).

[36]    163 P.3d 956 (Alaska 2007).

[37]    *Id.* at 960.

[38]    *See id.*

tenants who live with conditions that render a *dwelling* unfit, uninhabitable, or unsafe, or who are constructively evicted by those conditions."[39]   URLTA's habitability provision thus directs the court to consider the fitness and habitability of the *dwelling*; consideration is not limited to only those characteristics of the dwelling that were caused by the landlord's personal behavior.

The superior court explained that permit and code violations in the garage "impacted the habitability of the home" in violation of AS 34.03.100.  The court further explained how these code violations, when compounded by the actions of Dinh's employees, diminished the value of Raines and Clayton's leasehold.  The court followed AS 34.03.190's instruction to "determine whether the defense is supported by the evidence" by properly focusing its inquiry on the conditions existing inside Clayton and Raines's apartment.  The superior court's explanation linked the permit and code violations to specific habitability violations, which it found diminished the rental value. This satisfied the requirements of a counterclaim under AS 34.03.190.  We discern no clear error in these findings.

### 3. The superior court did not hold that Clayton and Raines were allowed to recover based on code violations existing in another tenant's unit.

Dinh argues that Clayton and Raines could not assert a URLTA counterclaim based on code violations existing in the unpermitted garage units because Dinh's employees were the parties who were "*actually* injured" by those violations.[40] Dinh also claims "[t]here is nothing to support the idea that a tenant may sue for any building code violations located in areas not subject to their leasehold."

As explained above, we have concluded that the conditions that gave rise to the habitability violations, including the presence of secondhand smoke and mildew

---

[39]     *Guilford*, 522 P.3d at 1106 (emphasis added) (quoting *Helfrich*, 207 P.3d at 561).

[40]     (Emphasis in original).

and the loss of hot water, were the result of Dinh's failure to maintain the premises occupied by Clayton and Raines in a habitable condition. The superior court thus correctly focused on the conditions existing in the residential unit occupied by Clayton and Raines and not on the conditions endured by Dinh's employees.

Dinh remained in exclusive legal control of the areas occupied by his employees. The superior court did not err by concluding that Dinh "had complete control over the premises." The fact that Dinh decided to let his employees live rent-free in the garage area of the apartment building did not relieve him of his legal duty to maintain Clayton and Raines's unit in habitable condition.

**4. The superior court did not hold that Dinh owed the tenants a duty of care to protect them from the criminal acts of other tenants.**

Dinh argues he should not be liable for the cost of Clayton and Raines's cable and internet bills, including their excess costs due to theft of services and the cost of switching providers. Dinh claims he is not responsible for "third party" criminal acts, such as his employees' theft of Clayton and Raines's internet and cable. But Dinh's argument again ignores the fact that he was in sole control over the garage area.

Alaska Statute 34.03.160(b) creates a "general remedy for the landlord's noncompliance with the rental agreement or the warranty of habitability."[41] This remedy also "incorporates the right to obtain exemplary damages (one and one-half times actual damages) for unlawful ouster and the landlord's willful diminution of essential services."[42] The "essential services" enumerated in AS 34.03.210 and AS 34.03.280, include "electric, gas, water, [and] sanitary" services. Alaska Statute 34.03.100 lists similar services, but adds the requirement that they must be "supplied or required to be supplied by the landlord." Cable and internet services, which Clayton

---

[41]    *Guilford*, 522 P.3d at 1097.

[42]    *Id.* at 1099 (citing AS 34.03.160(b), .210, .280).

and Raines obtained on their own, are not "essential services" under URLTA. Clayton and Raines thus could not recover damages for these services under AS 34.03.100, AS 34.03.210, or AS 34.03.280.

But AS 34.03.160 also creates a general remedy for "any noncompliance by the landlord with the rental agreement." Per the rental agreement, Clayton and Raines were "responsible for all utilities and services incurred in connection with the Premises." The rental agreement provided that Clayton and Raines were required to notify Dinh if "the [apartment's] condition changes so that, in Tenant's opinion, the . . . rental value of the Premises are adversely affected."

Raines placed Dinh on notice that his employees were stealing his internet and cable services. Once Dinh was on notice, the rental agreement obligated Dinh to address the issue. He failed to do so. Instead, the issue persisted, forcing Clayton and Raines to switch internet providers and incur $1,050 in damages. This was a breach of the rental agreement for which AS 34.03.160 granted Clayton and Raines a statutory remedy. The superior court did not err by awarding $1,050 in damages to Clayton and Raines for the cost of switching internet and cable providers.

**B.     The Superior Court Correctly Concluded That Dinh Willfully Diminished Essential Services Under AS 34.03.210.**

The superior court found that Dinh willfully diminished Clayton and Raines's essential services under AS 34.03.210.[43] Alaska Statute 34.03.210 creates a remedy only if "the landlord unlawfully removes or excludes the tenant from the premises or wilfully diminishes services to the tenant by interrupting or causing the interruption of electric, gas, water, sanitary, or other essential service to the tenant." This remedy provides for the recovery of "one and one-half times the actual

---

[43]     AS 34.03.210 (providing that tenant may recover "an amount not to exceed one and one-half times the actual damages" from landlord who "wilfully diminishes services to the tenant by interrupting or causing the interruption of electric, gas, water, sanitary, or other essential service" to the tenant).

damages."[44] The term "willful" contemplates a "voluntary or intentional" act coupled with an accompanying "conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong."[45]

Dinh argues that the superior court erred because it included internet and cable — which do not qualify as "essential services" under AS 34.03.210 — in its willful diminution of services finding. But the court's finding on this issue did not clearly identify which services it considered essential. Elsewhere in the order, the court explained that Dinh's employees had used Clayton and Raines's cable and internet in addition to heating fuel, hot water, and electricity. It appears to us that the court considered all utilities, including cable and internet, as essential services in its finding.

As explained above, internet and cable do not qualify as essential services. But heating fuel, electricity, and hot water certainly do qualify.[46] Thus, to the extent it did so, it was error for the court to include cable and internet as essential services, but it was not error to include heating fuel, electricity, and hot water.

Dinh attempts to undercut the degree to which Raines was inconvenienced by the interruption of essential services by characterizing Raines's testimony as saying "that on a handful of occasions, he had hot or luke warm water."[47] But Raines's testimony focused on how often he *lacked* hot water, which Raines said was "multiple times every month" and "through the whole tenancy." When considered in context,

---

[44] AS 34.03.210.

[45] *Willful*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[46] *See* AS 34.03.210 (listing "electric, gas, water, sanitary, or other essential service[s]").

[47] Dinh adopts this characterization of Raines's testimony to argue that the superior court's exemplary damages award was not reasonably related to evidence in the record. While we vacate the superior court's exemplary damages award, the crux of Raines's testimony nonetheless helps establish that Dinh willfully diminished essential services.

Raines's testimony makes it clear that he was substantially inconvenienced by the interruption of hot water.

Dinh argues that he did not act willfully. But the evidence shows Dinh caused the conditions leading to the interruptions of service. Dinh went through a city permitting process where his request for additional units in the garage was denied. By housing his employees in the unpermitted garage units, Dinh exceeded the scope of his conditional use permit. Although a violation of a conditional use permit is not a per se diminishment of essential services, Dinh's willfulness is clear because he housed employees in his garage after being denied his request to have additional residential units there.

The record also demonstrates Dinh's knowledge of the conditions leading to the interruption of essential services. The technician hired by Raines to inspect the boiler testified it was drawing power from Raines's electricity meter and using fuel from Raines's fuel tank to heat the unpermitted dwelling units in the garage and supply the garage bathroom with hot water. Considering the building's permitting history, Dinh knew or should have known that the layout of the garage units violated his conditional use permit, which required one electricity meter for each dwelling unit. But when it was brought to his attention, he failed to rectify this problem.

Under the circumstances of this case, at the very least, Dinh acted with inexcusable carelessness by failing to rectify the diminishment of essential services to Clayton and Raines's apartment.[48] As noted above, "inexcusable carelessness" is part of the definition of "willful" in Black's Law Dictionary.[49] The superior court's finding

---

[48]     *Cf. Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1101 (Alaska 2023) (explaining that "the special remedies for failure to supply essential services are available for both negligent and deliberate conduct" but that "Alaska law punishes more culpable conduct with a damages multiplier").

[49]     *Supra* note 44.

of willful diminishment of services was not in error and Clayton and Raines were entitled to "one and one-half times the actual damages" per AS 34.03.210, as long as an award of such damages does not result in double recovery.

## C. Clayton And Raines Are Not Entitled To Damages For Failure To Deliver Possession Under AS 34.03.170.

The superior court found that Dinh failed to deliver possession of the apartment to Clayton and Raines within the meaning of AS 34.03.170. We agree with the superior court that Dinh failed to deliver possession. However, Clayton and Raines were not entitled to damages under AS 34.03.170 for failure to deliver possession because they did not give notice soon enough to avail themselves of that remedy.

Three interrelated statutes are relevant to the landlord's obligation to deliver possession of the premises. First, AS 34.03.170(a) provides that:

> If the landlord fails to deliver possession of the dwelling unit to the tenant as provided in AS 34.03.090, rent abates until possession is delivered and the tenant may (1) upon at least 10 days written notice to the landlord terminate the rental agreement and upon termination the landlord shall return all prepaid rent and security deposits; or (2) demand performance of the rental agreement by the landlord and if the tenant elects, maintain an action for possession of the dwelling unit against the landlord and any person wrongfully in possession and recover the damages sustained.

AS 34.03.170(b) further provides that "an aggrieved tenant" may recover "one and one-half times the actual damages" if "a person's failure to deliver possession is wilful and not in good faith." Second, AS 34.03.090(a) provides that "[a]t the commencement of the term the landlord shall deliver possession of the premises to the tenant in compliance with the rental agreement and AS 34.03.100." Third, AS 34.03.100 enumerates the landlord's obligation to "maintain fit premises." Reading these three statutes together, whether a tenant may recover for a landlord's failure to deliver possession thus depends on whether the landlord supplied possession of the dwelling unit, which in turn requires

delivery of premises in compliance with the rental agreement and URLTA's requirement of habitability.

Clayton and Raines sought to recover under AS 34.03.170 for Dinh's failure to deliver habitable premises.[50]  Under AS 34.03.090(a), "at the commencement" of the rental term the landlord must deliver possession "in compliance with . . . AS 34.03.100," which is URLTA's habitability provision.  Dinh was thus also obligated to satisfy this condition upon delivering possession.  We have not previously considered whether damages may be awarded for a failure to deliver habitable premises.  Accordingly, we must consider the requirements of habitability and possession to determine whether Clayton and Raines may recover under AS 34.03.170.

The modern warranty of habitability was developed as a rejection of the historical common law principle of *caveat emptor*, which required the tenant to "inspect the land for himself and take it as he finds it, for better or for worse."[51]  As landlord and

---

[50]  Dinh also argues that AS 34.03.170 applies only if the "landlord fails to deliver possession of the *dwelling unit*." (Emphasis in original).  Dinh claims that even if the shipping container was not placed on the "*premises*," there is no violation of this requirement because the shipping container's placement "did not affect the leasehold." Dinh's argument fails on the plain language of the statue.  Alaska Statute 34.03.170 incorporates the delivery requirements "as provided in AS 34.03.090," which in turn mandates that "the landlord shall deliver possession of the *premises* to the tenant in compliance with the rental agreement."  AS 34.03.090(a) (emphasis added).  Because the rental agreement in this case explicitly allowed Raines to store his shipping container on the building's premises, Dinh was obligated to satisfy this condition upon delivering possession.  However, Raines never incurred damages because his shipping container remained on the neighbor's property until he was evicted by a valid court order.  Because Raines suffered no actual damages from Dinh's apparent failure to deliver possession of premises suitable for storing the shipping container, this claim provides no basis for recovery under AS 34.03.170.

[51]  *Newton v. Magill*, 872 P.2d 1213, 1216 (Alaska 1994) (quoting WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 63, at 400 (4th ed. 1971)); *see also Pugh v. Holmes*, 405 A.2d 897, 900-05 (Pa. 1979) (describing development of implied

tenant statues subsumed, replaced, and modified the existing common law,[52] courts began treating habitability as a factual issue,[53] incorporating considerations of housing codes, health and safety impacts, and enforcing the explicit requirements of URTLA.[54]

As a result of these developments, courts in various jurisdictions began to recognize that a "substantial violation" of applicable housing codes constituted a breach

---

warranty of habitability at common law and concluding that "the doctrine of Caveat emptor has outlived its usefulness and must be abolished," and that "in order to keep in step with the realities of modern day leasing, it is appropriate to adopt an implied warranty of habitability in residential leases").

[52] *See Newton*, 872 P.2d at 1217 n.5 ("The commentary to the URLTA explicitly recognizes that the common law antecedents of existing landlord-tenant law are 'inappropriate to modern urban conditions and inexpressive of the vital interests of the parties and the public which the law must protect." (quoting Unif. Residential Landlord & Tenant Act § 1.102 cmt. 7B (1985)); *see also McCall v. Fickes*, 556 P.2d 535, 537 n.3 (Alaska 1976) (stating English common law doctrines "are inappropriate to modern urban conditions and inexpressive of the vital interests of the parties and the public which the law must protect").

[53] *State, Dep't of Nat. Res. v. Alaskan Crude Corp.*, 441 P.3d 393, 401 (Alaska 2018) ("[O]rdinarily the question of materiality must be left to the factfinder."); *accord Mease v. Fox*, 200 N.W.2d 791, 796 (Iowa 1972) ("[Fitness for habitation] will usually be a fact question to be determined by the circumstances of each case."); *Pugh*, 405 A.2d at 905 ("Materiality of the breach is a question of fact to be decided by the trier of fact on a case-by-case basis."); *Glasoe v. Trinkle*, 479 N.E.2d 915, 920 (Ill. 1985) ("Whether there has been a breach of the warranty [of habitability] is a question of fact to be determined on a case-by-case basis.").

[54] *Amick v. Metro. Mort. & Sec. Co.*, 453 P.2d 412, 414 (Alaska 1969) (proposing that whether differences in opinion may exist about "tenantability" of a dwelling is "question of fact"), *overruled on other grounds by Wickwire v. City & Borough of Juneau*, 557 P.2d 783, 785 (1976). The Alaska pattern jury instructions also contemplate treating some habitability violations that are "not covered by the enumerated § 100 conditions" as legal issues. *See* Alaska Pattern Jury Instructions Civ — 30.00. For example, they propose the possibility of treating "rampant vermin infestation, [as] a violation of § 100 as a matter of law." *Id.*

of the implied warranty of habitability if it materially affected health or safety.[55] The materiality of a breach turned on "the nature, seriousness and duration of the defect"[56] in light of relevant "community standards."[57] The dichotomy between material habitability violations and nonmaterial habitability violations is reflected by URLTA in the tenant's general remedy: A tenant may recover *damages* for any noncompliance with AS 34.03.100, but may *terminate the lease* only for material noncompliance.[58]

URLTA adopted the historical "English Rule" of possession,[59] under which the landlord had a duty to deliver actual physical possession of the leased premises to the tenant, as opposed to the "American Rule," which merely required delivery of the legal right to possession.[60] The Restatement (Second) of Property states

---

[55] *See, e.g.*, *Hilder v. St. Peter*, 478 A.2d 202, 208 (Vt. 1984) ("A substantial violation of an applicable housing code shall constitute prima facie evidence that there has been a breach of the warranty of habitability."); *cf. Green v. Superior Ct.*, 517 P.2d 1168, 1183 (Cal. 1974) ("In most cases substantial compliance with those applicable building and housing code standards which materially affect health and safety will suffice to meet the landlord's obligations . . . .").

[56] *Pugh*, 405 A.2d at 906.

[57] *Detling v. Edelbrock*, 671 S.W.2d 265, 270 (Mo. 1984) (en banc) ("Habitability is to be measured by community standards, reflected in most cases in local housing and property maintenance codes."), *abrogated on other grounds by Heins Implement Co. v. Mo. Highway & Transp. Comm'n*, 859 S.W.2d 681, 684 n.2 (Mo. 1993) (en banc).

[58] *Compare* AS 34.03.160(b), *with* AS 34.03.160(a).

[59] UNIF. RESIDENTIAL LANDLORD & TENANT ACT § 301 (1972) (providing that "[t]his section . . . adopts the position that actual possession, as distinguished from a mere legal right to possession, must be delivered to the tenant at the commencement of the term of the lease."); *see also* Christopher W. Sullivan, *Forgotten Lessons from the Common Law, the Uniform Residential Landlord and Tenant Act, and the Holdover Tenant*, 84 WASH. U.L. REV. 1287, 1315 (2006).

[60] *Compare, e.g.*, *Dilly v. Paynsville Land Co.*, 155 N.W. 971, 972 (Iowa 1916) (adopting English Rule and explaining that "there is an implied covenant between

---

that the tenant's remedy for a landlord's failure to deliver possession may change depending on whether the tenant physically enters onto the leased premises,[61] whether the habitability violation affects health or safety,[62] and whether the tenant knew about the condition of the premises prior to entry.[63] The Restatement further states that if, upon entry, the tenant finds the premises are deficient, then the tenant is obligated to notify the landlord within a reasonable time.[64] Courts in other jurisdictions have found inadequate delivery of possession even after brief periods of entry by the tenant.[65] We

---

the lessor and the lessee that, when the time comes for the lessee to take possession, the premises shall be open to him for that purpose, and he is under no obligation to maintain an action against one in possession to secure such right"), *with, e.g.*, *Snider v. Deban*, 144 N.E. 69, 71 (Mass. 1924) (adopting American Rule and explaining that "[t]he lessee is entitled as of right under the implied covenant of the lease to enter upon and enjoy the premises for the entire term. . . . But there is no breach of this implied covenant when a party is in possession wrongfully holding after the expiration of a pre-existing lease").

[61]   RESTATEMENT (SECOND) OF PROPERTY: LANDLORD & TENNANT § 5.3 (AM. L. INST. 1977) ("[T]he remedies available to the tenant before entry, because of the unsuitable condition of the leased property . . . , are available to him after entry if the landlord does not correct the situation within a reasonable period of time . . . , unless the tenant's entry constitutes a waiver."); *see also id.* cmt. b ("The rule of this section recognizes the waiver doctrine but leaves to the facts of the particular case whether the entry justifies the conclusion that there has been a waiver.").

[62]   *Id.* cmt. c ("The tenant as matter of law is unable to waive any remedies available to him at the time of entry, if at the time of entry it would be unsafe or unhealthy to use the leased property in the manner contemplated by the parties.").

[63]   *Id.* cmt. e (AM. L. INST. 1977) ("If the tenant at the time of entry neither knows nor should have known of the condition of the leased property that creates the unsuitable condition, his entry does not constitute a waiver of any remedies.").

[64]   *Id.*

[65]   *See, e.g.*, *Lemle v. Breeden*, 462 P.2d 470, 472-75 (Haw. 1969) (finding material breach of implied warranties allowing tenants to rescind rental agreement when tenants entered premises and discovered rats that evening, tenants notified landlord next day, but landlord failed to remedy issue within three days); *Claus v. Deware Enters.,*

find these authorities persuasive in their reasoning that delivery of possession of a leased dwelling requires more than the transfer of physical possession of the premises at the commencement of the lease term.

Dinh cites a Nebraska case, *Vasquez v. Chi Properties, LLC*,[66] for the proposition that "[a] tenant who accepts possession and lives on the property for several months does not have a claim for failure to deliver possession because the duties under [URLTA] pertain to the beginning of the lease term." The tenant in *Vasquez* possessed the dwelling for six months before bringing a claim for failure to deliver possession.[67] The court in *Vasquez* considered Nebraska's URLTA possession statutes[68] and determined that the tenant did not have a claim "because the duties described in [the Nebraska URLTA possession statute] pertain to the 'commencement' of the lease

---

*L.L.C.*, 136 P.3d 964 (table), 2006 WL 1816406, at *1, *4 (Kan. App. 2006) (finding that landlord violated provision of URLTA requiring landlord "to initially deliver a habitable premises at the commencement of the lease term" after tenant moved his belongings into an apartment and discovered "over 100 cockroaches in the kitchen" on first night); *Ahlstrom v. Campbell Real Est., LLC*, 482 P.3d 17, 18, 21 (Okla. Civ. App. 2020) (holding failure to deliver possession existed when tenants entered premises and found broken air conditioning and strong odor, tenants notified landlord that day, and landlord failed to remedy issue within day; concluding that tenant could terminate lease with written notice and no opportunity for landlord to cure).

[66]     925 N.W.2d 304, 315 (Neb. 2019).

[67]     *Id.* at 316.

[68]     Nebraska's version of URLTA closely parallels Alaska's version. *Compare* Neb. Rev. Stat. § 76-1418 (providing that "[a]t the commencement of the term the landlord shall deliver possession of the premises to the tenant in compliance with the rental agreement" and habitability requirements), *and* Neb. Rev. Stat. § 76-1426 (providing that if landlord "fails to deliver possession of the dwelling unit to the tenant as provided in section 76-1418, rent abates until possession is delivered and the tenant shall" terminate the rental agreement upon notice or demand performance and recover damages), *with* AS 34.03.090, *and* AS 34.03.170.

term."[69] This authority is also persuasive in reasoning that temporal constraints should limit the tenant's ability to challenge delivery of possession to a time soon after entry.

We consider AS 34.03.170 in harmony with URLTA as a whole, including URLTA's purpose and precedent, legislative intent, and the authorities discussed above, and we conclude that at the commencement of the term of the lease, a tenant's entry onto the premises ordinarily constitutes delivery of possession of the premises under AS 34.03.090. However, a landlord does not deliver possession when there are habitability violations under AS 34.03.100 that materially affect health or safety and: (1) such violations are existing but unknown to the tenant upon entry; (2) they are discovered by the tenant within a reasonable time after entry; and (3) the tenant provides written notice of the violations to the landlord that is reasonably contemporaneous with discovery of the violations.

Returning to the facts of this case, Clayton and Raines failed to notify Dinh in writing of the habitability issues within a reasonable time after entering onto the premises and thus did not preserve their claim under AS 34.03.170 that Dinh failed to deliver possession as required by AS 34.03.090. The lease began on November 1, 2019. Clayton testified that she first smelled cigarette smoke drifting from the unpermitted basement dwelling units "about a week into" the lease. Raines testified that he first learned people were living below the apartment "probably [a] couple weeks into [the lease] or a month." He also testified that he noticed insufficient hot water beginning in November 2019. But the standing master found that Raines did not provide written notice via a text message to Dinh until April 2020, approximately five months after the beginning of the lease and several months after Raines claimed he discovered the habitability violations. The superior court repeated a similar date in its findings of fact.

---

**69**     *Vasquez*, 925 N.W.2d at 315.

The lack of hot water and Dinh's employees' cigarette smoke qualified as habitability violations materially affecting health or safety. Although the violations were existing and unknown upon entry and discovered within a reasonable time after entry, Clayton and Raines waited six months to report the issue to Dinh in writing. Because of this fact, Clayton and Raines may not recover for failure to deliver possession of the premises under AS 34.03.170. The superior court's order awarding damages under AS 34.03.170 was thus made in error.

### D. There Was No Clear Error In The Determination of Property Damages.

The superior court awarded Dinh $178.19 for the cost of repairing door trim, which Clayton and Raines acknowledged had been damaged by their dog. The superior court denied Dinh damages for replacing the apartment's keys, repainting the apartment, and patching the hole in the floor. The court also ordered Dinh to return Clayton and Raines's security deposit. Dinh argues that the court clearly erred because it did not find that the inspection checklist prepared by Tran was presumptive evidence of the condition of the apartment before and after Clayton and Raines's tenancy. We conclude that the inspection checklist did not satisfy the statutory requirements to qualify as presumptive evidence. We thus affirm the court's denial of any additional damages beyond the $178.19 for repairing the door trim.

A landlord may require a "premises condition statement" as part of the rental agreement.[70] Alaska Statute 34.03.020(e) defines a premises condition statement as "setting out the condition of the premises, including fixtures . . . , and [including], if applicable, a contents inventory itemizing or describing all of the furnishings and other contents of the premises and specifying the condition of each of them." A premises condition statement must be signed by the landlord and the tenant to become part of the

---

[70] AS 34.03.020(e).

rental agreement.[71]  A landlord or tenant may then use a premises condition statement as the basis for determining whether a security deposit should be applied to damages.[72] In an action initiated to recover damages under URLTA, a premises condition statement is also "presumptive evidence of the condition of the premises" and "may be offered by a party, without additional supporting evidence, as the basis on which to compute the recovery of damages."[73]  Clear and convincing evidence of inauthenticity is required to rebut this offering.[74]

Tran testified that she prepared an inspection checklist on the same day she toured the apartment with Clayton and Raines.  Tran signed the inspection checklist on behalf of Dinh and emailed it back to Clayton and Raines.  Raines testified that Tran also provided him a blank inspection checklist, which he filled out, signed, and returned with the first month's rent.  Clayton and Raines never signed Dinh's inspection checklist and Dinh never signed Clayton and Raines's inspection checklist.  Tran's inspection checklist thus failed to comply with AS 34.03.020(e), which requires both the landlord's and tenant's signatures.[75]  Because of this deficiency, Tran's inspection checklist did not qualify as a "premises condition statement" and did not create presumptive evidence of damages under AS 34.03.335.  Because the inspection checklist was not presumptive evidence of damages, the superior court did not err by

---

[71]  *Id.* ("When signed by the landlord and tenant, the premises condition statement and contents inventory completed under this subsection become part of the rental agreement.").

[72]  AS 34.03.090(b)(1)(A)-(B).

[73]  AS 34.03.335 (providing that, in action to recover damages, condition premises statement prepared under AS 34.03.020(e) is "presumptive evidence of the condition of the premises," unless its authenticity is rebutted by clear and convincing evidence).

[74]  *Id.*

[75]  *See supra* note 71.

applying the preponderance of the evidence standard. The court found that "the apartment had moisture and water damage" that caused "damage to the floor and . . . peeling paint in the hallway." The court attributed these damages to "normal wear and tear" and Dinh's "failure to repair."[76] Because Clayton and Raines were not responsible for these damages and because Dinh failed to provide Clayton and Raines with essential services, the court found that Dinh was not entitled to keep Clayton and Raines's security deposit. Evidence in the record supports these findings. Thus the court did not err by denying Dinh's claim for property damages beyond the $178.19 for repairing the door trim.

### E. Errors In The Calculation Of Damages Require Remand.

The superior court awarded "$15,468.58 in damages for "URLTA violations." This amount was the sum of: (1) $8,800 for diminution-in-value damages awarded under AS 34.03.190; (2) $962.59 for electricity and $1,893.99 for heating fuel from Dinh's employees using Clayton and Raines's utilities; (3) $1,050 for the cost of switching internet and cable providers; (4) $580 for moving expenses; and (5) the returned security deposit in the amount of $2,200. We calculate the sum of these amounts to be $15,486.58, not $15,468.58. We attribute this difference to a clearly erroneous math or typographical mistake.[77] Applying the correct calculation, we review the basis for this award.

---

[76]   *See* AS 34.03.070(b)(2)(A)-(B) (excluding from damages "normal wear and tear" and deterioration "caused by the landlord's failure to prepare for expected conditions").

[77]   *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 393 (Alaska 2017), *as amended on reh'g* ("[D]eciding the amount of compensatory damages is the job of the finder of fact, whether a jury or the judge in a bench trial; as such it is subject to the clear error standard of review.").

The court also awarded $10,000 for willfully diminishing essential services under AS 34.03.210 and an additional $10,000 for failure to deliver possession under AS 34.03.170.  We also review the basis for these awards.

### 1. It was legal error to allow double recovery of diminution in value and award damages for moving expenses.

Dinh argues that the superior court erred by allowing double recovery of $8,800 in diminution-in-value damages.  We agree.

As we have explained above, Clayton and Raines succeeded on their habitability counterclaim under AS 34.03.190.  Therefore, it was not error to credit $8,800 toward their unpaid rent "to reflect the diminution in value of the dwelling unit during the period of noncompliance."  The court found that the "leasehold was diminished by the $8,800 that is owed in past rent."  But the court also awarded damages totaling $15,486.58 for "URLTA violations," which included the sum of the damages awards for Clayton and Raines's security deposit, moving costs, costs from switching cable and internet providers, electricity, and heating fuel *plus* $8,800 for diminution in the value of the leasehold, awarded under AS 34.03.180.

The superior court allowed Clayton and Raines double recovery.  The court found the tenants did not owe Dinh $8,800 in unpaid rent that he claimed.  But it also incorporated that amount in its calculation of Clayton and Raines's URLTA damages.  The court effectively awarded Clayton and Raines twice the diminution in value of their leasehold by crediting them for $8,800 based on their defense to Dinh's possession claim while also including that value in their damages award.  This was an incorrect application of URLTA, amounting to a clearly erroneous miscalculation.

Dinh also argues that the superior court erred by awarding damages for moving expenses.  The court awarded $580 for Raines's moving expenses (Clayton having moved out months earlier). This amount included $280 that Raines spent hiring his friend to help him move out of the apartment and $300 to move the shipping

container after he was evicted. Dinh argues that Clayton and Raines are responsible for moving costs because they were "validly evicted for non-payment of rent." We agree.

After the possession hearing, the master recommended awarding Dinh possession of the apartment. The superior court adopted the master's recommendation and ordered Clayton and Raines to leave the apartment within five days. Raines incurred the moving costs because of the court's valid eviction order. Because Clayton and Raines were required to vacate the apartment by law, it was error to award Raines moving costs and we reduce the total award by $580.

In sum, the superior court erred twice in calculating damages. It was error to double count $8,800 in diminution-in-value damages because this award caused Clayton and Raines to recover twice on a single claim. It was also error to award $580 in damages for moving expenses because those costs were incurred as a result of a validly obtained court-ordered eviction. We reduce the total "URLTA violations" damages award by $9,380 and affirm the remaining $6,106.58.

### 2. The award of damages under AS 34.03.210 did not have a reasonable basis.

The superior court awarded Clayton and Raines $10,000 for "Diminished Services" for Dinh's violation of AS 34.03.210. On appeal, Dinh argues that "even if an 'essential service' was diminished, such as hot water, then the damages award of $10,000 is not reasonably related to any evidence before the Court, and the Court erred in its arbitrary award amount." We agree that the amount of this award lacks a reasonable basis in the record.

The evidence before the superior court showed that Dinh knew the unpermitted garage-level dwelling units drew heat and hot water from Clayton and Raines's boiler, which caused them to incur additional heating fuel and electricity costs. The court calculated these costs to be $962.59 for electricity and $1,893.99 for heating fuel, totaling $2,856.58. As explained above, internet and cable television do not qualify as "essential services" under AS 34.03.210. Even assuming the superior court

was applying the "one and one-half times" damage multiplier per AS 34.03.210, the award of $10,000.00 far exceeds the amount supported by the record. We reverse the superior court's award made pursuant to AS 34.03.210 and remand with instructions for the superior court to make an award that is supported by the record. But if the superior court awards damages under AS 34.03.210, then an award compensating Clayton and Raines for the same damages cannot be made under another URLTA provision.

### 3. The award of damages under AS 34.03.170 was made in error, but any damages to which Clayton and Raines are entitled may be recouped under AS 34.03.160, provided there is no double recovery.

Above we reverse the superior court's conclusion that Clayton and Raines can recover for failure to deliver possession under AS 34.03.170. As a consequence, we conclude that the court's award of $10,000 in "exemplary damages" associated with this finding was also made in error. But because damages awarded under AS 34.03.170 and AS 34.03.160 are based on substantively similar breaches, either of the rental agreement or of the warranty of habitability, Clayton and Raines may recover for such breaches under AS 34.03.160.

The tenant's remedy under AS 34.03.160 has three subsections. First, subsection .160(a) provides that a tenant may terminate the rental agreement for "a material noncompliance by the landlord with the rental agreement or a noncompliance with AS 34.03.100 materially affecting health and safety." Second, subsection .160(b) provides that a tenant may recover damages for "any noncompliance by the landlord with the rental agreement or AS 34.03.100." Third, subsection .160(c) provides that damages are a remedy "in addition" to terminating the rental agreement.

Alternatively, there are two ways for a tenant to recover damages for failure to provide possession under AS 34.03.170. First, under subsection .170(a)(2), if the tenant "demand[s] performance of the rental agreement by the landlord," the tenant may maintain an action for possession against "the landlord or any person

wrongfully in possession and recover the damages sustained." Second, under subsection .170(b), the tenant may recover "one and one-half times the actual damages" if "a person's failure to deliver possession is wilful and not in good faith."

The Restatement (Second) of Property states that a tenant "is entitled to recover damages from the landlord for his failure to fulfill his obligations under the lease . . . so long as no double recovery is involved."[78] If a tenant is able to prove damages, it does not matter whether the tenant proceeds under AS 34.03.170 for the landlord's failure to deliver possession or under AS 34.03.160 for the landlord's general noncompliance with applicable law. Both remedies ultimately have the same source: a violation of either the rental agreement or the warranty of habitability under AS 34.03.100.[79]

But recovery of damages under one remedy precludes recovery under the other. The only difference is that the general remedy under AS 34.03.160 applies to breaches after commencement of the lease and the specific remedy under AS 34.03.170 applies only to breaches at the commencement of the lease, corresponding to the landlord's obligation to deliver possession of habitable premises.

The award made pursuant to AS 34.03.170 was error. On remand, Clayton and Raines may recover damages for habitability violations under

---

[78] RESTATEMENT (SECOND) OF PROPERTY: LANDLORD & TENNANT § 10.2 (AM. L. INST. 1977) (providing that a tenant may recover: (1) fair market value of the lease; (2) loss sustained due to reasonably foreseeable expenditures; (3) relocation costs; (4) cost of substitute premises; (5) reasonably foreseeable anticipated profits, if the parties' contemplated use of the premises is for business purposes; (6) costs of eliminating the default; and (6) interest).

[79] *Compare* AS 34.03.160, *with* AS 34.03.170 (referencing landlord's obligation to deliver possession under AS 34.03.090, which requires delivery of the premises at commencement of the lease term in compliance with rental agreement and AS 34.03.100).

AS 34.03.160 provided any amount is supported by the record and there is no double recovery under AS 34.03.210 or any other URLTA provisions.

## V.    CONCLUSION

We AFFIRM the superior court's findings as to habitability violations. We REVERSE the superior court's award of damages to the extent that it results in double recovery of diminution-in-value damages and to the extent that it allows recovery for moving expenses.

We AFFIRM the award of "URLTA violations" damages in the amount of $6,106.58 and REVERSE as to the remaining $9,380.

We AFFIRM the superior court's finding as to willful diminution of essential services for heat, hot water, and electricity, but we REVERSE the superior court's conclusion that internet and cable are essential services. We VACATE the damages award of $10,000.00 for willful diminution and REMAND for further proceedings consistent with this opinion.

We REVERSE the superior court's findings as to failure to deliver possession, VACATE the award of $10,000 made in connection with this finding, and REMAND for further proceedings consistent with this opinion.

We AFFIRM the superior court's findings as to property damages to the leased premises.