**Jennifer R. SNYDER, a minor, and Kenneth O. Snyder, and Rhonda Snyder, parents of Jennifer R. Snyder, a minor, Appellants,**

v.

**J. Timothy FOOTE, M.D., and Tanana Valley Medical–Surgical Group, Inc., Appellees.**

No. S–3756.

Supreme Court of Alaska.

Dec. 13, 1991.

Kenneth W. Legacki, Anchorage, and Donovan R. Flora, Longfelder, Tinker, Kidman & Flora, Inc., P.S., Seattle, Wash., for appellants.

Marcus R. Clapp and David F. Leonard, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

A jury returned a defense verdict in a medical malpractice suit. The Snyders appeal the admission of certain evidence. We reverse.

### I.

The parties do not dispute the relevant underlying facts. On July 6, 1987, Jennifer Snyder's parents took her to see Dr. Timothy Foote, a pediatrician. Jennifer was six years old, and was complaining of abdominal pain. Dr. Foote diagnosed Jennifer as having gastroenteritis.

Dr. Foote's diagnosis was incorrect; in fact, Jennifer had a ruptured appendix.

On July 9, Jennifer returned to the clinic and later that day entered Fairbanks Memorial Hospital. Her appendix was removed the following morning. The infection in Jennifer's abdomen, or peritonitis, was quite advanced. Jennifer later returned to the hospital and was operated on for a bowel obstruction. The bowel obstruction was caused by the peritonitis. Moreover, because of the peritonitis and consequent scarring in her abdomen, Jennifer is probably at risk for future bowel obstructions and sterility.

On April 27, 1988, Jennifer and her parents (the Snyders) filed a medical malpractice suit against Dr. Foote. Pursuant to AS 09.55.536 and Civil Rule 72.1, the superior court appointed an expert advisory panel (Panel) on December 19, 1988. Three Fairbanks physicians were appointed to the Panel, a pediatrician, a surgeon, and an emergency services doctor. While AS 09.-55.536 requires the Panel to issue a report within thirty days, because of certain delays, the superior court notified the Panel that its report was due on March 10, 1989. The Panel issued a report on March 3, 1989, which was written and signed by just one panel member, Dr. Rundquist, the pediatrician. This report was filed with the court, but it was not on a prepared form. The report contained both criticism and exculpation of Dr. Foote.

The Panel issued a more formal report on April 2, 1989. This report was in a question and answer format, containing the questions enumerated in AS 09.55.536(c).[1] This second report was generally favorable to Dr. Foote.

On April 14, 1989, the Snyders moved to strike the second report of the Panel on the bases that it was untimely, that there was already a Panel report, and that Dr. Rundquist was professionally acquainted with Dr. Foote. The motion noted that the report was issued on April 2, approximately five months after the appointment of the Panel, and that trial was set for May 15. The Snyders argued that this afforded them insufficient time to prepare, especially in light of the fact that many pretrial deadlines, such as the listing of expert witnesses, had passed. The superior court denied the Snyders' motion to strike the Panel's April 2 report and to exclude testimony of the members of the Panel.

On May 11, the Snyders moved for reconsideration on the basis that Dr. Rundquist and Dr. Foote had a financial relationship which made it Dr. Rundquist's duty to recuse himself from the Panel. The Snyders asserted that Dr. Rundquist used Dr. Foote's clinic as relief for on-call coverage when Dr. Rundquist was unavailable, and that a second doctor on the Panel treated Dr. Foote's attorney's wife. The superior court denied the motion for reconsideration.

Prior to trial the Snyders had informed Dr. Foote that they intended to call Dr. Alan Done as an expert witness. Thereafter, the Snyders learned that Dr. Foote planned to impeach Dr. Done at trial, with findings of fact made by a trial court of another jurisdiction. As a consequence, the Snyders filed a motion for a protective order to prevent Dr. Foote from pursuing this line of impeachment of Dr. Done, or, in the alternative, for a continuance.

Dr. Foote planned to impeach Dr. Done by using the findings from a proceeding in the superior court of the District of Columbia. In this proceeding, Judge Wolf found that Dr. Done had misstated his credentials

---

1. AS 09.55.536(c) states,

> Not more than 30 days after selection of the panel, it shall make a written report to the parties and to the court, answering the following questions and other questions submitted to the panel by the court:
>
> (1) What was the disorder for which the plaintiff came to medical care?
>
> (2) What would have been the probable outcome without medical care?
>
> (3) Was the treatment selected appropriate for the case?

> (4) Did an injury arise from the medical care?
>
> (5) What is the nature and extent of the medical injury?
>
> (6) What specifically caused the medical injury?
>
> (7) Was the medical injury caused by unskillful care?
>
> (8) If a medical injury had not occurred, how would the plaintiff's condition differ from the plaintiff's present condition?

at a trial which had taken place some three years earlier. At the earlier trial, Dr. Done appeared as an expert witness for the plaintiff against defendant Merrell Dow Pharmaceuticals. *See Oxendine v. Merrell Dow Pharmaceuticals*, 563 A.2d 330 (D.C.App.1989) (*Oxendine II*), cert. denied, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990).[2] Given his holding that Dr. Done had misstated his credentials, Judge Wolf granted Rule 60(b) relief to Merrell Dow.

At a pretrial hearing, the superior court denied the Snyders' motion for a protective order or continuance. The superior court's ultimate ruling allowed inquiry into the testimony and findings of the 1986 District of Columbia Rule 60(b) hearing.[3] The court disallowed any reference to Judge Wolf's conclusion that "Dr. Done knowingly and intentionally testified falsely at the trial," but allowed Dr. Foote to state that a judge had made the findings of fact which formed the basis for cross examination.

The case went to trial before a six person jury on May 18, 1989. The jury returned a verdict in favor of the defense. Thereafter, the Snyders filed a motion for new trial on June 26, 1989. On August 11, 1989, the District of Columbia Court of Appeals reversed Judge Wolf's 60(b) ruling, and reinstated the original verdict in *Oxendine*. *Oxendine II*, 563 A.2d 330. The Snyders' notified the superior court of this development by a supplement to their motion for new trial. The Snyder's motion for a new trial was denied and this appeal followed.

---

**2.** In 1981, Dr. Done had testified in favor of plaintiff Mary Oxendine in her suit against Dow Pharmaceuticals. *See Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 563 A.2d 330, 331 (D.C.App.1989) (*Oxendine II*) cert. denied 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990). The jury returned a verdict in favor of Oxendine, and it was affirmed on appeal. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100 (D.C.1986) (*Oxendine I*). In 1986, more than three years after the jury verdict, Merrell Dow filed a Rule 60(b) motion asking the court to vacate the judgment on the grounds that Done had misstated his credentials. Rule 60(b) in the District of Columbia, like Alaska, allows relief from a final judgment on the grounds of "[m]istakes; inadvertence; excusable neglect; newly discovered evidence; fraud.... or any other reason justifying relief from the operation of the judgment." *Oxendine II* at 332–33 n. 5 (quoting Super.Ct.Civ.R. 60(b)(6)).

A hearing on the 60(b) motion was held before Judge Wolf. According to the *Oxendine II* court, "Judge Wolf found that Dr. Done knowingly and intentionally gave false testimony at trial in six areas, all of which, the judge conceded, related to Dr. Done's qualifications and not to any substantive issues in the case." *Id.* at 332. Judge Wolf found that this false testimony was "crucial" and created a "substantial danger that there was an unjust result"; he concluded that this entitled Merrell Dow to the "extraordinary relief [of vacation of a judgment and] a new trial." *Id.* at 333 (quoting Memorandum Order of February 11, 1986, at 3–5). Oxendine appealed, and the District of Columbia Court of Appeals reversed. It stated that "for a verdict to be vacated on the ground of perjured testimony it must be clear that the perjury was material and not merely incidental to the contested issue." *Id.* at 334 (citation omitted). As to five of the six misstatements, the court of appeals found that Merrell Dow could have presented the evidence of Dr. Done's credentials at trial. As to the other, the question of when Dr. Done resigned from Wayne State University, the court concluded that the evidence was too immaterial to support a reversal of the jury verdict. *Id.* at 337. Indeed, the court doubted whether this evidence was sufficiently relevant to have been introduced at trial. *Id.* *Oxendine II* was not decided until August 11, 1989, following completion of the trial in the instant case.

**3.** The final ruling of the superior court on this matter came at trial during the following colloquy:

> MR. FLORA [the Snyders' attorney]: [J]ust for clarification, Your Honor, is the Judge's ruling that Mr. Clapp [Foote's attorney] can read from this decision findings of fact one through, well, half of twenty?
> THE COURT: That's correct.
> MR. FLORA: And he can read it off this sheet and ask Dr. Done each of these questions separately in the course of cross examination?
> THE COURT: Mr. Clapp can ask him if he previously testified concerning these items and it was determined that his testimony was not as he said. He can ask him those questions, yes.
> MR. FLORA: Is the Court's present ruling that then Mr. Clapp cannot say that the court made factual determinations regarding whether Dr. Done was telling the truth?
> THE COURT: That's correct.
> ....
> MR. FLORA: So he can say, "Didn't a judge find that Dean Nadler ... asked him to resign"

On appeal, the Snyders' main contentions are that the superior court erred in allowing Dr. Done, their primary witness as to Dr. Foote's negligence, "to be cross examined with the hearsay 'findings' of another judge which findings were subsequently overturned on appeal" and further erred in admitting into evidence "Expert Advisory Panel Report No. 2."

## II.

The impeachment of Dr. Done involved the admission of two controversial facts:[4] first, the superior court admitted evidence that Dr. Done had misstated his credentials at a previous trial; second, the superior court allowed admission of the fact that Judge Wolf had made findings of fact concerning Done's alleged misstatements. We hold that the admission of these two categories of fact constitutes reversible error. Our study of the parties' arguments persuades us that no basis for the admissibility of this evidence has been demonstrated and that admission of this evidence cannot be characterized as harmless error.

The Snyders argue that evidence of Dr. Done's misstatements and Judge Wolf's findings is not admissible because it raises collateral issues. Therefore, they contend that Alaska Evidence Rule 402, which allows admission only of relevant evidence, precludes admission of this evidence.[5] The Snyders further assert that by admitting this evidence the superior court transformed their malpractice action into a trial of Dr. Done. Dr. Foote responds by arguing, in part, that impeachment of an expert witness' credentials is always relevant.

We have adopted a two-prong test for admissibility of evidence: (1) the evidence must make a proposition more or less likely, and (2) the proposition must be material to the case. *Poulin v. Zartman,* 542 P.2d 251, 260 (Alaska 1975), *disavowed on other grounds, State v. Alex,* 646 P.2d 203, 208 n. 4 (Alaska 1982). We have held that "evidence which is offered to contradict a collateral matter is inadmissible." *Shane v. Rhines,* 672 P.2d 895, 898 n. 2 (Alaska 1983); *see also Morrell v. State,* 575 P.2d 1200, 1204 (Alaska 1978) (impeachment of witness as to a collateral matter not allowed). Evidence is collateral if it is not otherwise admissible. *Babinec v. State,* 586 P.2d 966, 968 n. 14 (Alaska 1978) ("Facts will be considered non-collateral, and hence open to impeachment, if one of two tests is satisfied: the facts are relevant to substantive issues in the case or are independently provable by extrinsic evidence, apart from the contradiction, to impeach or disqualify the witness.").

The fact that Dr. Done may have misstated his credentials at a previous trial is not germane to his actual credentials. Moreover, the fact that Judge Wolf made certain findings is collateral to the question of Dr. Done's credentials and not relevant to the proceeding which gave rise to this appeal.

Dr. Foote argues that the questioned impeachment of Dr. Done was proper because Dr. Done's credibility was a material issue. Dr. Foote cites to our statement in *Hutchings v. State,* 518 P.2d 767, 769 (Alaska 1974), that "[t]he credibility of witnesses is always a material issue." *Hutchings* established a very lenient test for admissibility: "whether the evidence tends in reason to demonstrate the existence of some fact,

THE COURT: Yes.

**4.** In general, the trial court has discretion on whether or not to admit evidence. *Hutchins v. Schwartz,* 724 P.2d 1194, 1197 (Alaska 1986). Under Civil Rule 61, no error in the admission of evidence is ground for reversal unless the objecting party was prejudiced. *See Korean Air Lines Co., Ltd. v. State,* 779 P.2d 333, 339 (Alaska 1989)

**5.** The term relevant evidence is defined in Rule 401, Alaska Rules of Evidence, as follows:

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or of this state, by enactments of the Alaska Legislature, by these rules, or by other rules adopted by the Alaska Supreme Court. Evidence which is not relevant is not admissible.

state of mind or condition that a reasonable person would take into account in assessing the credibility of the witness under attack." *Id.* At issue in *Hutchings,* however, was witness bias, an issue which is never collateral. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) ("The partiality of a witness is subject to exploration at trial and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" (quoting 3A J. Wigmore *Evidence* § 940 at 775 (Chadbourne 1970))). As our cases make clear, the *Hutchings* test does not apply to all impeachments by use of collateral evidence. *See Babinec,* 586 P.2d at 968 n. 14.

■ Questions which go to expert qualifications and credentials are generally not objectionable. "Opposing counsel has the opportunity to cross-examine the witness on his qualifications as well as on his conclusions." *Lewis v. State,* 469 P.2d 689, 696 (Alaska 1970). *See also Timsah v. General Motors Corp.,* 225 Kan. 305, 591 P.2d 154, 164 (1979) ("Great latitude is necessarily indulged in the cross-examination of an expert witness in order that the intelligence and powers of discernment of the witness, as well as his capacity to form a correct judgment, may be submitted to the jury so it may have an opportunity for determining the value of his testimony."); *Ross v. Colorado Nat'l Bank of Denver,* 170 Colo. 436, 463 P.2d 882, 887 (1969) ("once a witness testifies as an expert, he subjects himself to the most rigid kind of cross-examination, including searching questions concerning his qualifications, the extent of his knowledge, and the basis of his opinion").

■ Facts which are relevant to Dr. Done's credentials were properly admitted. Questions about Dr. Done's research productivity, his resignation from a medical school faculty, and related questions, all tend to rebut Dr. Done's qualifications as an expert. To that extent, inquiry into those facts on cross-examination is permissible.

Dr. Done's previous testimony and the fact that Judge Wolf had entered findings, on the other hand, are only relevant to the extent that they imply that Dr. Done had committed previous bad acts. This impeaches his testimony only so far as it implies that he is likely to commit future bad acts.[6] Under Evidence Rule 608 such evidence is normally not admissible.[7] *See Patricia R. v. Sullivan,* 631 P.2d 91 (Alaska 1981) (Evidence Rule 608 bars admission of witness' prior acts of prostitution, when introduced to impeach witness' credibility); *Lahmeyer v. State,* 765 P.2d 985 (Alaska App.1988) (prior instances of untruthfulness by witness not admissible to impeach credibility). *See also Jones v. Bordman,* 243 Kan. 444, 759 P.2d 953 (1988) (prior instance of conduct, namely, untruthfulness as a witness, cannot be used to impeach at current trial); *State v. Smallwood,* 223 Kan. 320, 574 P.2d 1361 (1978)

---

6. Dr. Foote's attorney asked Dr. Done in open court, "And the purpose of that hearing, was it not, was to determine whether the judgment against Merrell Dow should be set aside because of the testimony that you had provided in that case? ... And are you aware of the specific findings of fact that the judge entered in that case after that four day evidentiary hearing?" Dr. Foote's attorney further questioned Dr. Done, "Some of the findings of fact are contrary to [your testimony] are they not?"

7. Evidence Rule 608 states,

   (a) **Opinion and Reputation Evidence of Character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness; and (2) evidence of truthful charac-

ter is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

   (b) **Specific Instances of Conduct.** If a witness testifies concerning the character for truthfulness or untruthfulness of a previous witness, the specific instances of conduct probative of the truthfulness or untruthfulness of the previous witness, may be inquired into on cross-examination. Evidence of other specific instances of the conduct of a witness offered for the purpose of attacking or supporting that witness' credibility is inadmissible unless such evidence is explicitly made admissible by these rules, by other rules promulgated by the Alaska Supreme Court, or by enactment of the Alaska Legislature.

(state not allowed to cross-examine witness regarding prior false statements).

■ Dr. Foote distinguishes *Patricia R.* by stating that in *Patricia R.*, "the witness' character had not been put in issue." It is not clear on what basis Dr. Foote believes Dr. Done's character to have been an issue at trial; Rule 608(b) allows specific instances of conduct only in response to testimony of a character witness concerning the character for truthfulness or untruthfulness of a previous witness. Given the absence of the admissibility predicate for this type of evidence, Judge Wolf's findings cannot be considered character evidence admissible under Rule 608(b). Dr. Foote is incorrect when he asserts that Dr. Done's character, as opposed to his credentials, was at issue at trial.[8]

■ Dr. Foote further contends that the questioned evidence is admissible to show bias. Evidence Rule 613(a) states that "evidence of bias or interest on the part of the witness ... [is] admissible for the purpose of impeaching the credibility of a witness." Thus, Dr. Foote could have introduced evidence that showed Dr. Done's favoritism towards the Snyders. However, evidence of the findings in the *Oxendine* case are not admissible on a bias theory, because these findings of fact have no tendency to demonstrate that Dr. Done entertained a bias in regard to his testimony at the trial in superior court.[9]

Additionally, we agree with the Snyders that the factual findings of Judge Wolf constitute inadmissible hearsay, because they are out of court statements, admitted for their truth.[10] Dr. Foote agrees that Judge Wolf's findings are hearsay, but asserts that the factual findings of a court of law are admissible under Evidence Rules 803(8) (public records exception) and 803(23) (general hearsay exception). Dr. Foote contends that there are sufficient indicia of trustworthiness to admit Judge Wolf's findings under either of these exceptions.

Evidence Rule 802 states that "[h]earsay is not admissible except as provided by these rules, by other rules prescribed by the Alaska Supreme Court, or by enactment of the Alaska Legislature." Evidence Rule 803(8) provides an exception for public records which includes "factual findings resulting from an investigation made pursuant to authority granted by law." Dr. Foote believes that this public records

---

8. Dr. Foote argues that the Snyders themselves introduced the evidence of the *Oxendine* hearing in their case-in-chief. Therefore, Dr. Foote believes that the Snyders "opened the door" to admission of the evidence of Dr. Done's prior testimony and Judge Wolf's findings. However, at pretrial, the court had ruled this evidence admissible. Moreover, Dr. Foote had represented to the court that he would admit as much of Judge Wolf's findings as the court allowed. Admittedly, the superior court later qualified its pretrial ruling. Importantly, however, at the time the Snyders questioned Dr. Done about the *Oxendine* proceedings, the superior court had made its final ruling about the admissibility of this evidence. Thus, after a careful review of the record, we conclude that the law of the case was that the evidence was admissible. Hence, the Snyders did not "open the door to this impeachment."

9. Dr. Foote notes that "the majority of [Dr. Done's] time is spent serving as an expert," that "Dr. Done stands to profit from his effectiveness as an expert," and that Dr. Done was the sole proprietor of an investigating and consulting firm. These facts are admissible because they tend to establish favoritism. Dr. Foote then concludes that "[t]he jury has a right to hear all

of the information regarding Dr. Done to assess his credibility" and that "[b]y hearing the impeachment, the jury could apply human experience to determine if Dr. Done would shape his testimony to gain himself favor with lawyers in medical cases." Here, Dr. Foote's argument clearly goes to prior bad acts: because Dr. Done was previously found to be an incredible witness, he wants the jury to conclude that Dr. Done would similarly lie here. There is nothing in the fact of Judge Wolf's previous findings that would inherently bias Dr. Done toward the Snyders. This fact cannot be admissible on a bias theory.

Evidence Rule 613 also allows admission of prior inconsistent statements made at a trial. The case that Dr. Foote cites to support the proposition that "[t]he jury has a right to hear all of the information regarding Dr. Done to assess his credibility," *Bentley v. State*, 397 P.2d 976, 978 (Alaska 1965), is a prior inconsistent statement case.

10. Evidence Rule 801(c) defines hearsay as follows:

Hearsay is a statement other than one made of the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

exception allows admission of Judge Wolf's findings.

However, subsection (b)(iv) of the public records exception excludes "factual findings resulting from special investigation of a particular complaint, case, or incident" from falling within the exception. Evidence Rule 803(8)(b)(iv). The Snyders argue that the 60(b) hearing on *Oxendine* was a special investigation. As a result, they conclude that any findings from that hearing should not have been admitted at their trial.

■ In general, the public records exception to the hearsay rule does not allow admission of prior civil judgments. As McCormick explains,

Where the doctrines of res judicata or collateral estoppel ... make the determinations in the first case binding in the second, of course, the judgment in the first case is not only admissible in the second, but it is as a matter of substantive law conclusive against the party. If neither res judicata nor collateral estoppel applies, however, the courts have traditionally been unwilling to admit judgments in previous cases. The judgments have been regarded as hearsay and not within any exception to the hearsay rule.

E. Cleary, *McCormick on Evidence* § 318 at 894 (3d ed. 1984) (footnote omitted).

■ The wisdom of this rule is illustrated in the case at bar. Many of Judge Wolf's findings rely on a secondary layer of hearsay—Judge Wolf had to listen to testimony and resolve the credibility of witnesses.[11] Evidence Rule 805 requires that "hearsay within hearsay" itself be admissible. If their testimony was relevant and material to issues in the case at bar, the *Oxendine* witnesses should have testified before the superior court, unless their former testimony itself fell under an exception to the hearsay rule. Alaska Evid.R. 805. In sum, the evidence of Judge Wolf's findings is inadmissible hearsay.[12]

■ Finally, Dr. Foote asserts that the Snyders were not prejudiced by the admission of the contested impeachment evidence. Dr. Foote believes that Dr. Done's testimony was unpersuasive and minor without consideration of the questioned impeachment evidence. Dr. Foote further contends that the weight of the evidence overwhelmingly supports the jury's verdict. He therefore concludes that if there was any error, it was harmless.

The Snyders respond that Dr. Done was their only pediatric expert witness who testified as to the applicable standard of care and that his credibility was destroyed due to the improper impeachment. They cite *Hawkins v. Thornton*, 92 Ariz. 211, 212, 375 P.2d 565, 566 (1962), for the proposition that effective and improper impeachment of a key witness is grounds for reversal of a jury verdict.

■ Under Civil Rule 61, "[n]o error in either the admission or the exclusion of evidence ... is ground for ... setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice." This court has held that where presentation of irrelevant

**11.** Former testimony is admissible under Evidence Rule 804(b)(1) but only if the declarant is unavailable, and only if the *party* against whom it was offered had an opportunity and similar motive to develop that witness' testimony in direct, cross, or redirect examination. Under this rule, the underlying testimony which came out at the *Oxendine* Rule 60(b) hearing is inadmissible in the instant case. If the underlying testimony is inadmissible, it follows that conclusions based on that testimony would not be admissible for the same reasons—lack of opportunity for the party in interest, the Snyders, to defend against the testimony. *See Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir.1980) (summary of witness testimony at previous trial not admissible public record exception of the federal rules of evidence because current party did not have opportunity and motive to develop testimony at previous proceeding).

**12.** As the above analysis illustrates, this evidence similarly does not qualify for the "catch-all" exception, 803(23). Additionally, the existence of the findings by Judge Wolf fails the first two requirements of that exception: first that the statement "is offered as evidence of a material fact"; second, that it be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." The fact of Judge Wolf's findings is not material and Dr. Foote could have procured more probative evidence to impeach Dr. Done.

evidence produces no prejudicial effect, it is harmless and not grounds for reversal. *Nelson v. State,* 628 P.2d 884 (Alaska 1981).

In a previous medical malpractice case, we determined that admission of certain evidence was error, because the evidence was irrelevant. *Poulin v. Zartman,* 542 P.2d 251, 259 (Alaska 1975), *disavowed on other grounds, State v. Alex,* 646 P.2d 203, 208 n.4 (Alaska 1982). However, we did not reverse because we found that the evidence was harmless. *Poulin* emphasized that harmless error "does not require proof of harm beyond a reasonable doubt." *Id.* at 261. Instead, the standard of review requires this court to put itself in the place of the jury, to determine whether, as reasonable jurors, "the error committed probably affected their verdict." *Id.* (quoting *Love v. State,* 457 P.2d 622 (Alaska 1969).

In *Poulin,* we examined the entire record, noting the gravity of the case and the minimal exposure of the irrelevant evidence. *Id.* We concluded that "[i]n light of the record as a whole, ... a reasonable jury would not have been affected by this testimony and that this particular jury was not affected by this testimony." *Id.*

Here, unlike *Poulin,* we believe that the inadmissible impeaching evidence played a dominant role in the trial. Defense counsel emphasized the importance of the evidence both during the evidentiary phase at trial and in closing argument.[13] Further, Dr. Done was the Snyders' only expert witness. We cannot say that the improper impeachment would not have affected a reasonable juror. We conclude that the erroneous admission of this impeaching evidence was prejudicial error.

In conclusion we hold that the superior court erred by admitting the questioned

findings. The fact that Dr. Done had previously misstated his credentials is collateral and inadmissible evidence of prior bad acts under Evidence Rule 608. Further, the fact that Judge Wolf made certain findings is also collateral and for the reasons above stated such errors are prejudicial and require reversal.[14]

### III.

The Snyders also assert error in the admission of the second report of the Expert Advisory Panel, raising three objections. First, they claim the report was untimely. Alaska Statute 09.55.536(c) requires a written report from the Panel within thirty days of appointment. Here the Panel issued its report 105 days after appointment. Second, the Snyders note that one doctor on the Panel, Dr. Rundquist, occasionally used Dr. Foote's clinic for relief on-call coverage. The Snyders believe that this use created a conflict of interest. The Snyders further argue that the second report of the Panel was inadmissible under Civil Rule 72.1(b)(2), which requires that Panel members disclose anything which would create an "appearance of bias." Third, the Snyders believe that the Panel report contains implicit resolutions of factual questions, yet fails to disclose the factual assumptions made by the experts. Specifically, the Snyders believe that the report necessarily adopted one of Dr. Foote's written chart notes over the other. Thus, the Snyders argue that the Panel report contravenes AS 09.55.536(d) which requires that "[i]n any case in which the answer to one or more of the questions submitted to the panel depends upon the resolution of factual questions which are not the proper subject of expert opinion, the report shall so state...."

---

**13.** In *Poulin,* we specifically noted that the inadmissible evidence was not mentioned in closing. 542 P.2d at 261. Here, defense counsel stated in closing, "The reason I [attacked Dr. Done] is because he's a liar. And I proved he was a liar—under oath. And don't take my word for it. Take the judge who made the decision in the evidentiary hearing, that in the *Oxendine* case the judge found that as a matter of fact complete inconsistencies in Dr. Done's testimony."

**14.** We also note our agreement with the Snyders' further argument that this evidence should have been excluded upon application of the balancing test called for in Evidence Rule 403. This rules provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The issues raised by the Snyders are fact specific. We decline to decide these issues on this record. For example, the extent of Dr. Foote's business relationship with Dr. Rundquist and whether Dr. Foote knew of the relationship, but failed to disclose it, is not clear from this record. Nor is it clear whether the Panel in fact made, and failed to disclose, factual assumptions based on the evidence before it. Given the late release of the report,[15] the Snyders may have been hampered in their effort to build a factual record on these issues. Therefore, should they choose to do so, on remand, the Snyders may move for a new panel report on these grounds. This will allow the superior court to determine the merits of the motion.[16]

## IV.

The judgment is REVERSED and VACATED and the matter REMANDED for further proceedings not inconsistent with this opinion.

---

**15.** Dr. Foote argues that *Roethler v. Lutheran Hosp. & Homes Soc'y of America, Inc.,* 709 P.2d 487 (Alaska 1985), stands for the proposition that the *only* remedy for a late Panel report is a lifting of the discovery ban. *Roethler* held that when a report is eighty days late, the trial court must lift the discovery ban. *Roethler* did not discuss the exclusivity of this remedy.

Here, the Snyders did not move for a lifting of the discovery ban after eighty days had expired. However, in the peculiar circumstances of this case, this omission is excused. A preliminary Panel report was issued before the eighty day deadline. At the time, it was apparently not clear that this was not the official report. Therefore, if any of the Snyders' allegations of error have merit, the harmful effect of the error may have been compounded by the untimeliness of the final report, through no fault of the Snyders.

**16.** Our decision has made it unnecessary to address any of the remaining specifications of error which have been advanced in this appeal.