NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARIA THEREZA PINHO DE ALMEDIA GUIMARAES, | ) ) ) | Supreme Court No. S-18913 |
| Appellant, | ) ) | Superior Court No. 3AN-22-05446 CI |
| v. | ) ) | MEMORANDUM OPINION AND JUDGMENT* |
| DEAN SCHLEHOFER, | ) ) | No. 2052 – October 30, 2024 |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Ian Wheeles, Judge.

Appearances: Phyllis Shepherd, Phyllis Shepherd Law Firm LLC, Anchorage, for Appellant. Justin Eschbacher, Eschbacher & Eschbacher PC, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

A couple separated and the mother moved from Alaska to California with their four-year-old daughter. Both parents are deaf and their daughter is a hearing child. After the mother moved, the father filed for divorce in Alaska. The parties disputed where their child should attend school, and at the custody trial, the mother attempted to

---

\*        Entered under Alaska Appellate Rule 214.

establish that California offered better resources for children of deaf parents. The court awarded joint legal custody and shared physical custody. Although the court determined it was in the child's best interests to spend the school year in Alaska, it allowed the mother to visit and share custody in Alaska and travel with the child during the summer. The court denied the mother's subsequent motion for a new trial. The mother appeals the court's custody decision, several evidentiary rulings, and the decision to deny her motion for a new trial. We affirm the trial court's rulings.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Maria Thereza Pinho de Almedia Guimaraes married Dean Schlehofer in April 2016 and gave birth to Katherine in October 2017. Both Guimaraes and Schlehofer are deaf, but Katherine is a hearing child. Katherine and other hearing children with deaf parents are known as "Kids of Deaf Adults" or "KODA." Katherine has experienced some linguistic delay, and she had an Individualized Education Program (IEP) during some of her early schooling.[1]

Schlehofer owns a guiding business that leads fishing trips in Kenai, where he owns a home that doubles as a lodge for clients. During the parties' marriage, Guimaraes lived in Alaska with Schlehofer. Schlehofer and Guimaraes had a full-time nanny who shared childcare duties while the parties lived together. April Murray, who worked at the lodge, also helped with some childcare duties and attended doctor's appointments with Katherine.

In November 2021 the parties separated and Guimaraes left Alaska to travel with Katherine. Guimaraes first took Katherine to California, then to New York for a week, where they spent time with Schlehofer, and then to Brazil for three months.

---

[1]   IEPs are plans developed for children who are eligible for special education services to help them meet personalized academic and functional goals. *See generally* 4 Alaska Administrative Code 52.140; 34 C.F.R. § 300.320 (2024).

Guimaraes settled with Katherine in Riverside, California in February 2022, where they lived with Guimaraes's friend Ana Myrick, who is also deaf and has a hearing child. While living with Myrick, Guimaraes did not look for work and was receiving financial support from her family. In late February Schlehofer traveled to Riverside to co-parent Katherine and stayed until the middle of March. After Schlehofer returned to Alaska, he filed a complaint for divorce.

Guimaraes continued to travel extensively after Schlehofer filed the divorce complaint, and she remained unemployed through the custody trial. During June and July 2022, Katherine stayed with Schlehofer in Alaska for roughly six weeks while Guimaraes was in Europe. In March 2023, Schlehofer stayed with Katherine in California while Guimaraes traveled to Brazil, North Carolina, and Boston.

## B. Proceedings

### 1. The custody trial

The court bifurcated custody and property issues and held a three-day custody trial in July 2023. The central issue at trial was whether Katherine would spend the school year in Riverside with Guimaraes or in Alaska with Schlehofer. The parties' custody plans mirrored one another: The parties proposed that Katherine would attend school in their respective locations, and the other parent could travel to share physical custody during the school year.

Guimaraes elicited testimony about Katherine's unique needs as a KODA and Schlehofer's inability to meet those needs in Alaska. Guimaraes testified that Katherine missed an IEP meeting in June 2022, when Katherine was visiting Schlehofer in Alaska. A doctor who provided speech therapy for Katherine opined that it is "very important for Katherine to have . . . people . . . that can talk and help her on her language development."

Murray testified that Guimaraes moved from Alaska with Katherine because she "wanted better resources for young KODAs." Myrick testified that immersion in a larger KODA community was "enormously critical" for Katherine. But

she also noted that the KODA community and some resources, like KODA camps, were available to Katherine in Riverside during the summer.

Another witness, a family friend who lived in Riverside, suggested that Schlehofer interfered with Katherine's education. She testified that Schlehofer stayed with her for part of his visit to Riverside in the spring of 2022, and Katherine did not attend school during that period. The family friend also testified that she attended an IEP meeting with Guimaraes and that Schlehofer was absent because he was working. But she also provided favorable testimony for Schlehofer, expressing that he was generally an involved parent and "absolutely adores Katherine."

Schlehofer rebutted Guimaraes's case with testimony that his parenting abilities had improved and he was prioritizing Katherine's education. He explained that Katherine attended school while she visited him in Alaska and that he generally spent time with her "every single day" during her visit. Schlehofer's friend Jesus Contreras, who had stayed at the lodge and observed Schlehofer's parenting, testified that Katherine was "joined at the hip" with Schlehofer and that he was a "really good dad."

Schlehofer also claimed Guimaraes had at times refused to communicate with him or facilitate visits between him and Katherine after the parties separated. Schlehofer testified that, except for one short conversation, Guimaraes did not communicate with him for three months after he filed his divorce complaint, so he was not informed of IEP meetings and speech evaluations that he had missed. He also testified that Guimaraes did not respond to Schlehofer's attempts to plan a visit for Katherine's birthday in 2022 until it was too late for him to make travel arrangements. Further, Schlehofer testified that Guimaraes resisted his request to have Katherine visit him for holidays in 2022. Finally, Schlehofer testified that Guimaraes had put off his requests for FaceTime visits with Katherine, and that video calls with his daughter were "subject to availability and [Guimaraes's] willingness to accommodate."

During trial the court made several evidentiary rulings that are at issue on appeal. First, the court sustained an objection to the relevance of Guimaraes's question

about whether Contreras had been paid for help he occasionally provided to Schlehofer on guided fishing trips. Second, the court curtailed Murray's testimony about the KODA community in Riverside. Third, the court overruled Guimaraes's objections that Schlehofer's cross-examination of both Murray and Guimaraes exceeded the proper scope of cross-examination. Finally, the court overruled Guimaraes's objection when Schlehofer sought to admit text messages about a falling out between Guimaraes and Murray.

After trial the court concluded it was in Katherine's best interests to live with Schlehofer in Kenai during the school year and spend summers with Guimaraes.[2] Although the court ordered Katherine to spend the school year in Kenai, its award was contingent on Schlehofer not working on the water for his guiding business during his custodial time except when "absolutely necessary." The court stated it would entertain a motion to modify the custody award if Katherine's school performance was unsatisfactory or if she did not receive necessary speech therapy during the school year.

### 2. Guimaraes's motion for a new trial

Guimaraes filed a motion for a new trial on the grounds that the family friend in Riverside had new testimony about instances of Schlehofer's poor parenting. Guimaraes claimed the friend was unable to share this information during trial because she was suffering from mental health issues at the time. Guimaraes asserted that the friend's proffered testimony was "newly discovered" because Guimaraes's attorney "was not in a position to know" that the friend's condition would cause her to omit information at trial. The court denied the motion.

Guimaraes appeals the court's custody order, the evidentiary decisions noted above, and its decision to deny her motion for a new trial.

---

[2]     *See* AS 25.24.150(c) (requiring court to "determine custody in accordance with the best interests of the child").

## III. STANDARDS OF REVIEW

Trial courts have broad discretion in child custody decisions.[3] We reverse a trial court's custody decision only when "the record shows an abuse of discretion or if controlling factual findings are clearly erroneous."[4] The trial court abuses its discretion when it "fails to consider statutorily mandated factors, weighs factors improperly, or includes improper factors in its decision."[5] "A factual finding is [clearly] erroneous if, based on a review of the entire record, the finding leaves us with a definite and firm conviction that a mistake has been made."[6] Further, "[t]he trial court's factual findings enjoy particular deference when they are based primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[7]

We review a trial court's evidentiary rulings for abuse of discretion, which occurs when the decision is "manifestly unreasonable."[8] Further, we will reverse a trial court's evidentiary ruling "only if the error affected the substantial rights of a party."[9]

---

[3] *Sweeney v. Organ*, 371 P.3d 609, 612 (Alaska 2016).

[4] *Id.* (quoting *J.F.E. v. J.A.S.*, 930 P.2d 409, 411 (Alaska 1996)).

[5] *Id.* (quoting *Williams v. Barbee*, 243 P.3d 995, 1000 (Alaska 2010)).

[6] *Ott v. Runa*, 463 P.3d 180, 185 (Alaska 2020) (quoting *Bruce H. v. Jennifer L.*, 407 P.3d 432, 436 (Alaska 2017) (internal quotations omitted)).

[7] *Moore v. Moore*, 349 P.3d 1076, 1080 (Alaska 2015) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (internal quotation marks omitted)).

[8] *Dinh v. Raines*, 544 P.3d 1156, 1165 (Alaska 2024) (quoting *Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 619 (Alaska 2021)).

[9] *Id.* (quoting *Punches*, 480 P.3d at 620).

We review a trial court's refusal to order a new trial under Alaska Civil Rule 59 for an abuse of discretion[10] and "will not disturb the trial court's ruling 'except in exceptional circumstances and to prevent a miscarriage of justice.' "[11]

## IV.   DISCUSSION

We affirm the trial court's custody order.  The court's factual findings that underpin its best interests analysis are not clearly erroneous, and the court did not abuse its discretion in balancing the best interests factors or in making credibility determinations.  None of the evidentiary decisions that Guimaraes challenges require reversal.  And the court did not abuse its discretion in denying Guimaraes's motion for a new trial.

### A.   The Trial Court's Findings Are Not Clearly Erroneous, And It Did Not Abuse Its Discretion In Determining Katherine's Best Interests.

Guimaraes argues the court did not fully account for Katherine's needs,[12] erred in determining Schlehofer was capable of meeting her needs,[13] improperly weighed evidence of stability and continuity,[14] and erroneously found that she interfered with Katherine and Schlehofer's relationship.[15]

The court did not err in its best interests analysis.  First, testimony and documentary evidence support the court's findings regarding Katherine's needs, and the court did not ignore Katherine's unique circumstances; its order ensures she will receive speech therapy and allows her to access KODA-specific resources and community in Riverside during the summer.  Second, testimony supports the court's

---

[10]    *Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1248 (Alaska 2001).

[11]    *Jensen v. Goresen*, 881 P.2d 1119, 1125 n.14 (Alaska 1994) (quoting *Montgomery Ward v. Thomas*, 394 P.2d 774, 775 (Alaska 1964)).

[12]    *See* AS 25.24.150(c)(1).

[13]    *See* AS 25.24.150(c)(2).

[14]    *See* AS 25.24.150(c)(5).

[15]    *See* AS 25.24.150(c)(6).

conclusion that Schlehofer is capable of meeting Katherine's needs. Third, the court acted within its discretion in deciding which factors predominated within its stability and continuity analysis. Finally, the court's determination that Guimaraes inhibited visitation between Schlehofer and Katherine is not clear error.

### 1. The trial court did not fail to assess Katherine's physical, social, emotional, and academic needs.

The superior court concluded Katherine's needs were "mostly normal," that her only special need was speech and language therapy, and that attending school in a hearing community would support her language development.[16] Guimaraes claims this was error. She argues the court erred by discounting testimony about the importance of placing Katherine in a larger KODA community that could "uplift[] and provid[e] a safe haven for [her]."

The court's findings regarding Katherine's needs are not clearly erroneous. The doctor who had provided speech therapy for Katherine testified that it was "very important for Katherine to have . . . people . . . that can talk and help her on her language development." The doctor also explained that Katherine's language skills had improved significantly during her speech therapy sessions. Myrick testified that she observed improvement in Katherine's language skills after she was able to socialize with Myrick's hearing son. And while school district evaluations recommended speech and language intervention for Katherine's deficits in articulation and use of grammar, these evaluations did not identify other therapeutic needs.

Further, the trial court did not diminish the seriousness of Katherine's speech and language delay. The court acknowledged that "much was made by [Guimaraes's] witnesses of the community and support allegedly available in Riverside to Katherine as a hearing child of deaf parents." However, it determined that testimony was "contrived, embellished, speculative, and somewhat irrelevant." Although the

---

[16] *See* AS 25.24.150(c)(1).

subject matter of this testimony was relevant to the court's best interests analysis,[17] it was within the court's discretion to determine its credibility and assign appropriate weight.[18]  Further, the court recognized Katherine's "unique situation" as a KODA and it found her "greatest need" was developing her verbal skills.  And the court addressed that need in its order.  The court stated that it would entertain a motion to modify its custody award if Katherine did not receive speech therapy in Alaska.  The record supports the court's findings regarding Katherine's needs, and the court's custody order accommodates those needs.

> **2.  The trial court did not clearly err by finding that each parent was equally capable of meeting Katherine's needs.**

Guimaraes argues the trial court erred in determining that each parent's "capability and desire" to meet Katherine's needs was equal.[19]  She characterizes Schlehofer as uninvolved and unavailable during Katherine's school year.  Guimaraes further contends the court improperly presumed Schlehofer had improved, and will continue to improve, his parenting capabilities.

The court did not clearly err in finding Schlehofer is a "perfectly capable" parent.  Schlehofer testified that he had helped find a speech therapist for Katherine in Alaska in 2021.  He also explained that he had hired more guides so that he would be in the field less and would have more availability to care for Katherine, and that he had attended to childcare duties during Katherine's summer visit in 2022.  The court stated that it "accept[ed]" testimony that Schlehofer had become "a stellar father for the last two years."  Guimaraes argues that testimony that Schlehofer took Katherine out of school to spend time with him is evidence of his deficiency as a parent.  But differences

---

[17]  *See* AS 25.24.150(c)(1)-(2).

[18]  *Moore v. Moore*, 349 P.3d 1076, 1080 (Alaska 2015) ("[T]he trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence." (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011))).

[19]  *See* AS 25.24.150(c)(2).

between two parents' approaches to parenting does not preclude the court from finding that both are capable of meeting their child's needs.[20]  And Guimaraes's dissatisfaction with Schlehofer's decision-making does not undercut the court's capability finding.

Guimaraes argues that the court clearly erred in finding that she relied on nannies to care for Katherine, but this claim mischaracterizes the court's finding.  The court found that "both parents rely on people for support.  They've hired assistants, nannies, [and] other people to help with Katherine . . . ."  Testimony that the parties employed a nanny during their marriage, that the family friend in Riverside attended Katherine's IEP meetings with Guimaraes, and that Murray helped Guimaraes with childcare supports this finding.  Guimaraes did not refute this testimony, and we see no clear error in the trial court's finding.[21]

### 3. The trial court did not abuse its discretion in its analysis of concerns for Katherine's stability and continuity.

The court found that "stability [had been] good with both parents since birth" and that "[Schlehofer's] home in Kenai" and "[Guimaraes's] presence" each provided stability and continuity, so this factor was "essentially neutral."[22]  Consequently, each party's ability to travel to share custody of Katherine was "significantly impactful" to the court's decision, and the court considered which

---

[20]   *See Moeller-Prokosch v. Prokosch*, 99 P.3d 531, 537 (Alaska 2004) (holding superior court did not abuse its discretion by finding that "both parties equally desired and equally were able to meet [the child's] needs" where "evidence permitt[ed] a finding that [the parties] respond to [the child's] needs and approach parenting in different but equally adequate ways").

[21]   *See Bruce H. v. Jennifer L.*, 407 P.3d 432, 436 (Alaska 2017) ("A factual finding is [clearly] erroneous if, 'based on a review of the entire record, the finding leaves us with a definite and firm conviction that a mistake has been made.' " (quoting *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011))).

[22]   *See* AS 25.24.150(c)(5) (requiring court to consider "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity").

custody arrangement would best facilitate equally-shared physical custody. The court found Guimaraes's proposal was "contingent on [Schlehofer] moving to where she lives" and said it was really a proposal "to have primary custody of Katherine with the option of frequent visits by [Schlehofer] as often as he can afford." Schlehofer's proposal was a "mirror reflection of [Guimaraes's] real proposal."

The court determined Katherine would be more likely to spend equal time with each parent in the aggregate if she spent the school year in Alaska because Schlehofer works seasonally, while Guimaraes "does not work" and has "the ability and means to travel extensively." Under this arrangement Guimaraes would also be free to travel with Katherine during the summer. In other words, Guimaraes's superior ability to travel meant that Katherine would best maintain her relationship with both parents by spending the school year in Alaska where Schlehofer lived and where Guimaraes could visit to share custody.

Guimaraes contends the court improperly elevated certain factors — like the size of Schlehofer's Kenai home — while disregarding others — like the Riverside school district's knowledge of Katherine's educational needs — in its stability and continuity analysis. Guimaraes also argues the court "did not completely address" the stability and continuity factor "because the court . . . did not find facts . . . about the exact length of time that [Katherine] had spent in each environment post-separation[,] . . . the satisfactory nature of each environment for [Katherine], . . . [or] the desirability of maintaining continuity of that environment for [Katherine]." Finally, Guimaraes contends the court's custody determination was based on an erroneous finding that her proposal was contingent on Schlehofer moving to California.

The record supports the court's factual findings regarding stability and continuity, so they are not clearly erroneous.[23] Testimony that Katherine has her own

---

[23] *See Ott v. Runa*, 463 P.3d 180, 185 (Alaska 2020).

bedroom in Kenai and that she has spent time there since she was an infant supports the court's finding that "[Schlehofer's] home in Kenai is certainly a place of stability." Guimaraes conceded that if Katherine attends school in California, Schlehofer would have to move or visit to have the week-on, week-off custody that Guimaraes proposed, and she testified that she was unwilling to move to Alaska. Guimaraes had also requested that Katherine spend four or five weeks during each summer with her so they could visit family in Brazil. This testimony supports the court's finding that having Katherine spend the school year in Alaska and summers with Guimaraes would best facilitate shared physical custody without sacrificing Guimaraes's summer travel plans.

The court's factual findings provide sufficient support for its stability and continuity analysis. When analyzing AS 25.24.150(c)(5), trial courts may consider "a multitude of factors" including "the relationship with the custodial parent, the home provided by the custodial parent, the [child's] school, the community of friends and family, the cultural community, the [child's] relationship with the noncustodial parent[,]" and geographic stability.[24] Guimaraes is correct that Katherine's educational environment is relevant to the court's custody determination. But it is the trial court's role to decide which factors predominate.[25] And the court does not need to discuss each element of stability so long as its findings give "a clear indication of the factors [that the court] considered important in exercising its discretion or allow us to glean from the record what considerations were involved."[26]

In this case, the court's findings make clear that maintaining Katherine's positive relationship with each parent was the predominant factor in its stability and

---

[24] *Nancy M. v. John M.*, 308 P.3d 1130, 1135 (Alaska 2013) (third alteration in original) (quoting *Williams v. Barbee*, 243 P.3d 995, 1006 (Alaska 2010)).

[25] *Id.*

[26] *Angelica C. v. Jonathan C.*, 519 P.3d 334, 341 (Alaska 2022) (alteration in original) (quoting *Rosenblum v. Perales*, 303 P.3d 500, 504 (Alaska 2013)).

continuity analysis. In light of its finding that "[t]here's . . . plenty of stability in life with each parent," the court focused on determining how to best approximate 50/50 custody instead of maximizing Katherine's time with the parent who she had spent the most time with since the parties' separation. Under the facts and circumstances of this case, it was permissible for the court to elevate relational stability above geographic stability, even when the court's decision would require Katherine to attend school in a new district.[27]

> **4. The trial court's finding that Guimaraes had inhibited Katherine's relationship with Schlehofer is not clear error.**

The trial court found Guimaraes showed an unwillingness to facilitate the relationship between Katherine and her father. The court found Guimaraes had "shut down communication at times when she was upset" and at one point "essentially" did not communicate with Schlehofer for three months. The court noted that Guimaraes also "initially and unreasonably" denied holiday visits to Alaska, failed to share information about Katherine's education, and failed to invite Schlehofer to Katherine's IEP meetings and other assessments. Guimaraes suggests this was clear error because the court did not credit her explanations for failing to accommodate visitation or her eventual acquiescence in a stipulated order to Thanksgiving visitation in 2022.

Guimaraes's explanations for her behavior do not establish clear error. The record supports the court's findings regarding Guimaraes's unwillingness to "facilitate and encourage" Katherine's relationship with Schlehofer.[28] The court found that Guimaraes had "shut down communication at times when she was upset," that "she, essentially, wouldn't communicate for three months at one point," and that Schlehofer was "largely restricted [in] his frequency of contact to Katherine when she was with her mother." Schlehofer's testimony and text message evidence support the conclusion that

---

[27]  *See Nancy M.*, 308 P.3d at 1135.

[28]  *See* AS 25.24.150(c)(6).

Guimaraes was unresponsive to Schlehofer's requests for FaceTime visitation and a visit to California for Katherine's birthday in 2022. Guimaraes also stated in text messages that she would not let Katherine travel to Alaska for Thanksgiving without a court order, which supports the court's finding that she "initially and unreasonably" denied holiday visitation. We are therefore not left "with a definite and firm conviction" that the court erred.[29]

**B.    None Of The Evidentiary Decisions Guimaraes Challenges On Appeal Are Reversible Error.**

Guimaraes contends that the trial court made four errors in admitting or excluding testimony and evidence during trial. She argues the court erred by (1) barring her from asking Contreras whether he was paid to guide fishing excursions with Schlehofer, (2) barring her from eliciting testimony from Murray about the KODA community in Riverside, (3) allowing Schlehofer to cross-examine both Murray and Guimaraes about the falling out between the two of them, and (4) admitting text messages between Guimaraes and Schlehofer that provided context for Guimaraes's falling out with Murray. None of these evidentiary decisions require reversal.

It was not an abuse of discretion for the court to sustain Schlehofer's relevance objection when Guimaraes asked Contreras whether he was paid to work for

---

[29]    *Ott v. Runa*, 463 P.3d 180, 185 (Alaska 2020) (quoting *Bruce H. v. Jennifer L.*, 407 P.3d 432, 436 (Alaska 2017)). The court's stability and continuity analysis did not "clearly favor[]" Guimaraes, and its finding that Guimaraes inhibited Katherine's relationship with Schlehofer is not clear error. Thus, Guimaraes's argument based on *Vachon v. Pugliese*, that the court was required to "explore[] a less intrusive means" of ensuring Guimaraes facilitates Katherine's relationship with Schlehofer before ordering a change in custody, fails. *See* 931 P.2d 371, 373, 378-80 (Alaska 1996) (reversing custody order where stability and continuity factor "clearly favored" mother but trial court awarded a father sole physical custody based on erroneous finding that mother would interfere with his relationship with child).

Schlehofer. True, evidence that a witness may be biased is always relevant.[30] However, Guimaraes had already established that Schlehofer had long been friends with Contreras, provided him free lodging, and employed his daughter. Therefore, testimony that Schlehofer paid Contreras to guide infrequent fishing trips would have been cumulative.[31] Because Guimaraes had already established Contreras's bias, the court had discretion to curtail further testimony on that issue.[32]

The court did not abuse its discretion in refusing to allow Guimaraes to ask Murray about her knowledge of the KODA community in Riverside. Guimaraes argues this ruling was an abuse of discretion because the community available in Riverside was relevant to Guimaraes's ability to meet Katherine's needs. But other witnesses had already testified about the KODA community available in Riverside, so further testimony on this topic would have been cumulative.[33] Therefore, the court acted within its discretion when it limited Murray's testimony.[34]

Nor did the court abuse its discretion in allowing Schlehofer to inquire into Murray's falling out with Guimaraes while cross-examining Murray and

---

[30] *See Snyder v. Foote*, 822 P.2d 1353, 1358 (Alaska 1991) (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

[31] *See Pouzanova v. Morton*, 327 P.3d 865, 870 (Alaska 2014) (explaining "evidence supporting an uncontested or established fact [and] . . . evidence repeating a point made by previous evidence" is excludable as cumulative (alterations in original) (quoting *Wasserman v. Bartholomew*, 923 P.2d 806, 813 (Alaska 1996))).

[32] *See id.*; *see also United States v. Jackson*, 756 F.2d 703, 707 (9th Cir. 1985) (refusing to find limitation of cross-examination that probed witness bias was abuse of discretion where "jury was repeatedly made aware that [a witness] was paid $500" for cooperation with authorities and noting abuse-of-discretion inquiry "focuses upon whether the jury otherwise had sufficient information" to appraise witness's bias and motives).

[33] *See Pouzanova*, 327 P.3d at 870.

[34] *See* Alaska R. Evid. 403 (giving court discretion to exclude relevant evidence if it is cumulative).

Guimaraes. Guimaraes argues that broaching this subject during cross-examination was improper because it was beyond the scope of either witness's testimony on direct examination and was not relevant to credibility.[35] However, the nature of Murray's relationship with Guimaraes did not exceed the scope of Murray's direct examination, and it was relevant to both Murray's and Guimaraes's credibility.[36] Schlehofer's cross-examination of Murray revealed that she had reconciled with Guimaraes but had not made amends with Schlehofer, which tends to show Murray was biased toward Guimaraes. The reasons for the falling out were also relevant to Guimaraes's credibility because they challenged a statement Guimaraes made earlier in her cross-examination: Guimaraes initially claimed that she cut off contact with Murray because Schlehofer threatened to take Katherine if Guimaraes remained friends with Murray. Because Schlehofer's questions about the falling out were reasonably calculated to elicit testimony that was inconsistent with that statement, they fell squarely within the proper scope of cross-examination.[37]

---

[35] Guimaraes alternatively argues that Schlehofer impermissibly impeached Murray with a specific instance of conduct under Alaska Evidence Rule 608 and that the court impermissibly allowed impeachment on the collateral issue of whether Murray's and Guimaraes's relationship deteriorated. *See* Alaska R. Evid. 608; *Snyder v. Foote*, 822 P.2d 1353, 1358 (Alaska 1991). Guimaraes's resort to Rule 608 is misplaced. That rule governs how litigants may ask a character witness about a previous witness's specific instances of conduct that demonstrate the previous witness's character for untruthfulness and limits extrinsic evidence of such instances. Alaska R. Evid. 608(b). Here, Schlehofer sought to establish Murray's bias toward Guimaraes — and not anyone's character for untruthfulness — by cross-examining Murray about her relationship with each party.

[36] *See* Alaska R. Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.").

[37] *Id.*

Finally, the court did not abuse its discretion by admitting text messages that explained the context for Guimaraes's falling out with Murray. Guimaraes argues the court erred by admitting these messages. However, these messages were admissible as prior inconsistent statements because they contradicted Guimaraes's statement that Schlehofer's threat was her sole concern at the time she cut off communication with Murray during their falling out. Schlehofer complied with the procedural requirements for introducing the text messages as prior inconsistent statements, including the requirement that the examiner allow the witness to explain or deny any prior inconsistent statement when introducing extrinsic evidence of such a statement.[38] Schlehofer asked Guimaraes whether the text messages were hers, and she admitted that they were. Although the court did not let her explain the messages when Schlehofer introduced them, it allowed Guimaraes to explain them on redirect, satisfying the foundation requirement that a witness must be given an opportunity to explain a prior inconsistent statement.[39]

### C. The Trial Court Did Not Abuse Its Discretion By Denying Guimaraes's Motion For A New Trial.

Guimaraes argues the court abused its discretion in denying her motion for a new trial because the family friend in Riverside had "new" testimony that would have changed the result if she had given it at trial.[40] She suggests that additional

---

[38] Alaska R. Evid. 613(b).

[39] *See id.* 613(b)(1) ("The court shall permit witnesses to be recalled for the purpose of laying a foundation for impeachment if satisfied that failure to lay a foundation earlier was not intentional, or if intentional was for good cause . . . ."). Because the court initially cut off Guimaraes's explanation, Schlehofer's failure to lay a complete foundation was not intentional.

[40] *See* Alaska R. Civ. P. 59(a) ("A new trial may be granted . . . if required in the interest of justice."). In her motion Guimaraes requested a new trial or amended findings and judgment. However, her motion was based on testimony she alleged was newly discovered, so granting the motion would have required the court to hold new

testimony from the family friend would be particularly persuasive because she "was a friend to both [parties]."

Alaska Civil Rule 59(a) allows trial courts to order a new trial "if required in the interest of justice." To warrant relief under Rule 59, newly discovered evidence "must (1) be likely to change the result on a new trial; (2) have been discovered after trial; (3) not have been discoverable, with due diligence, before trial; (4) be material; and (5) not be cumulative or impeaching."[41]

The family friend's information fails to satisfy the requirements for granting a Rule 59 motion based on newly discovered evidence. She had already testified to some of the instances of poor parenting that she described in her post-trial affidavit supporting Guimaraes's motion. The trial court had this information when it determined "both parties are perfectly capable parents," so it would not have changed the result on a new trial, was not discovered after trial, and is cumulative.[42] Further, the family friend was Guimaraes's witness, and Guimaraes's attorney communicated with her via email, telephone, and video conference before trial. Guimaraes's attorney could have asked the friend for more information about Schlehofer's parenting in those meetings so that she could develop more comprehensive testimony on direct examination.[43] Guimaraes failed to demonstrate that her attorney could not have

---

trial proceedings to hear and evaluate that testimony before it could amend its findings and judgment.

[41]    *Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1261 & n.100 (Alaska 2001) (quoting *Dickerson v. Williams*, 956 P.2d 458, 467 (Alaska 1998) (extending standard established in *Montgomery Ward v. Thomas*, 394 P.2d 774 (Alaska 1964), to "all Rule 59 motions premised upon newly discovered evidence")).

[42]    *Id.*

[43]    *Montgomery Ward*, 394 P.2d at 776 (holding that testimony could have been discovered before trial despite being unanticipated where counsel had one full week before trial in which he could have contacted witness and moving party "had available to him ample discovery tools").

discovered the proffered information through this kind of due diligence. Therefore, Guimaraes cannot obtain relief under Rule 59.[44]

## V. CONCLUSION

We AFFIRM the trial court's custody order.

---

[44] *See Sengupta*, 21 P.3d at 1261.